IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

DECEMBER 1996 SESSION

FILED

June 6, 1997

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | No. 01C01-9603-CC-00103 |
| | ) | |
| Appellee | ) | |
| | ) | MAURY COUNTY |
| V. | ) | |
| | ) | HON. JIM T. HAMILTON, |
| STEVE MASON, | ) | JUDGE |
| | ) | |
| Appellant. | ) | (First Degree Murder and Attempted |
| | ) | First Degree Murder) |
| | ) | |

For the Appellant:

Shara Ann Flacy
District Public Defender
209 W. Madison Street
Pulaski, TN 38478
(At trial)

John Damron
Assistant Public Defender
209 W. Madison Street
Pulaski, TN 38478
(At trial)

John E. Herbison
2016 Eighth Avenue South
Nashville, TN 37204
(On appeal)

For the Appellee:

John Knox Walkup
Attorney General and Reporter

Daryl J. Brand
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0493

Michael T. Bottoms
District Attorney General

Robert C. Sanders
Assistant District Attorney
10 Public Square
P.O. Box 1619
Columbia, TN 38402

OPINION FILED: _____

AFFIRMED

William M. Barker, Judge

**OPINION**

The appellant, Steve Mason, appeals as of right his convictions in the Maury County Circuit Court of first degree premeditated murder and attempted first degree premeditated murder. He was sentenced to life in prison for the first degree murder conviction and received a sixty (60) year consecutive sentence as a career offender on the attempted offense. The jury also assessed a $50,000 fine.

Appellant argues on appeal that:

(1)     count two of the indictment is insufficient because it does not contain necessary facts to comprise every element of attempted first degree murder;

(2)     the trial court erred by failing to disqualify the District Attorney's office from prosecution in his case;

(3)     the evidence was insufficient to prove the elements of premeditation and deliberation on both counts;

(4)     the trial court erred in admitting appellant's prior convictions for aggravated robbery and attempted aggravated robbery; and

(5)     the trial court erred in imposing consecutive sentences.

Finding that no reversible error was committed by the trial court, we affirm appellant's convictions and sentences.

**FACTUAL BACKGROUND**

On August 4, 1994, Timothy McGill and Jesse Tate Jones were shot numerous times following a crap game which took place on Broadway Avenue in Mt. Pleasant. McGill suffered three gunshot wounds and died from these injuries. Jones, McGill's stepfather, was shot twice. After surgery and hospitalization, he recovered fully and suffered no permanent injuries. Jones and other eyewitnesses identified appellant as the assailant. Several days after the incident, appellant turned himself in to authorities in Louisville, Kentucky and was returned to this State for prosecution.

The State's proof demonstrated that shooting dice, or "craps" as it is commonly called, was played regularly in and around the Broadway Avenue area of Mt. Pleasant.

2

The location is a "high crime area." On the evening of August 3, 1994, a game began at about 8:00 p.m. and continued well into the morning hours of August 4, concluding around 3:00 a.m. The victims were in control of the game, at least one of them acting as "houseman" of the game at all times. The "houseman" is the person who supplies the dice and oversees the betting. Throughout the evening, the game had varying numbers of participants, including as many as twelve people at one point. Appellant arrived on Broadway around 11:00 p.m.[1] and remained until the game's conclusion, but he only participated in the game for a short while. He left the area once around 2:00 a.m. and was gone for about 20 to 30 minutes. Upon his return, those present at the game noticed that appellant had changed clothes. Prior to leaving, appellant had been dressed in light-colored clothing, primarily a white T-shirt and white pants. When he returned, he was dressed in all black, including his shoes, shorts, shirt and jacket.

The testimony of Jesse Tate Jones, the surviving victim, revealed that appellant was present as the game began to draw to a close. Anthony Webster, appellant's roommate and friend, had just lost a sum of money and declined to play the game any longer. Jones urged Webster to continue playing. Webster responded that he might play again tomorrow. Jones replied, "It may not be no tomorrow." Appellant then jumped up from where he was sitting, pulled out a gun and said, "That's what I say, won't be no tomorrow." He then began firing the weapon. Appellant first shot Jones in the jaw, who fell facedown on the street. Appellant then turned the gun on McGill and shot him once in the upper portion of his chest, just below the neck. He immediately whirled back toward Jones and shot him again in the back of the neck, as Jones lay facedown on the street. By that time, McGill had fled on foot and was running down the street. Jones watched appellant chase after McGill, firing the pistol. Two shots struck McGill, one in the lower back and one near the upper arm. The men disappeared from Jones' sight.

---

[1]This was the time provided by Jones. The other witnesses provided varying, but much later, estimates of the time of appellant's arrival.

By then, all the remaining participants had left the scene. Fortunately, Jones was able to walk to his truck parked nearby and drive the short distance to the police station. He reported the incident and was then taken to the hospital for treatment. Jones testified that no argument or cross words were exchanged prior to the shooting. He also stated that appellant's weapon looked like a .25 caliber automatic pistol.

The testimony of Terrence Williams and Vincent Wilson, who were both eyewitnesses to the shooting, substantiated the events detailed by Jones. Wilson added that he lost approximately $160 to McGill that night. He also stated that he had played the game for four or five hours that night and there had been no arguments or fights. Anthony Webster, appellant's roommate, testified in similar fashion. However, he stated that he and appellant did not arrive on Broadway until after 1:00 a.m. when they both got off work. He further explained that appellant lost $30 in the game and then borrowed money from him, which he also lost. It was then that appellant left and went home. He returned wearing the black clothing. Webster likewise denied that any argument occurred prior to the shooting.

Appellant's uncle by marriage, Vernon Johnson, Sr., also testified for the State. He reported that appellant appeared on his doorstep in the early morning hours of August 4, 1994. Appellant was very nervous and had a silver .25 caliber automatic pistol in his hands. He proceeded to tell Johnson that he had shot McGill and Jones. Appellant then asked Johnson to help him leave town. Johnson first declined, but was afraid for his family's safety and offered to take appellant wherever he needed to go. Johnson then took appellant to Columbia and left him there. He said that *en route*, they made one stop and appellant disposed of the gun at another person's home.

Law enforcement officials who investigated the crime scene discovered McGill's body on the sidewalk of Broadway Avenue in front of a funeral home, approximately 230 to 240 feet from the place where the shooting began. The body was found facedown on the pavement and the victim was dead when officials arrived. A pair of

4

green shorts, later identified as McGill's, were found next to the body. The pockets contained cigarettes, a lighter, and 32 cents in change. McGill's flip flops were also recovered near the scene of the initial shooting. Bullet casings were found several feet from where the shooting began and one spent casing was also found on the porch of the funeral home. These were identified as having been fired from a .25 caliber firearm and all were fired from the same weapon. The medical examiner reported at trial that McGill died from loss of blood, primarily as a result of the first gunshot wound which pierced his right lung.

Although appellant did not deny shooting the victims, his trial testimony described a somewhat different turn of events. He stated that on August 3, he worked from 3:30 p.m. until 1:00 a.m. at Shipper's Paper Products along with Anthony Webster. After work, someone drove him and Webster to Broadway where he then walked to his house nearby. He changed from his work clothes and put on black shoes, white socks, black shorts, black jacket, black shirt and black toboggan. Appellant was carrying the weapon with him at this time. He then proceeded to the crap game.

After arriving at the game, he watched for a while and noticed that a lot of cheating was occurring, accomplished by either Jones or McGill "switching the dice." He testified that everyone was losing money to them. He departed the game, went home and procured his own dice. Appellant then returned to participate in the game using his own dice. However, Jones and McGill refused to use his dice and he walked up the street to the corner. After about five minutes, appellant returned to the game to convince Jones and McGill to gamble with his dice. This time they agreed. Appellant stated that he began to win some money. As a result, he claimed that McGill got angry, started cursing him and made derogatory comments about appellant's father. While McGill was "yapping," appellant noticed Jones was reaching around behind his back, which made appellant think Jones had a gun. Jones also commented to the effect that if McGill tried anything he would "watch his back."

5

Appellant testified that McGill started coming towards him and he was scared.[2] He stated that he pulled out his pistol and just started shooting; he remembers firing five shots. Appellant denied chasing McGill with the gun, saying instead that all the shots were fired in one location. He then ran down the street and ducked into an alleyway because he was afraid Jones was going to run over him with his truck. Appellant insisted that he shot Jones first because he thought Jones was reaching for a gun. He also explained that McGill was well-known as a drug dealer who always carried a gun.

On cross-examination, appellant stated that he took the pistol with him to work that day and carried it in his right front pocket. He denied going home to get the gun, alleging instead that he had it with him throughout the game. He also professed that the gun belonged to Webster. Furthermore, he declared that Webster, Wilson and Williams could not have heard the argument between him and McGill because they were down the street when it happened. He also expressed his belief that Webster did not testify truthfully about the evening's events. Specifically, he repudiated Webster's testimony that he borrowed money from him.

Under continued cross-examination, appellant was unable to explain why the bullet casings were found in different areas. However, he claimed that he shot McGill as he ran away because he was scared and he "just commenced to shooting." In addition, appellant insisted that Johnson was mistaken about him having the gun when he asked for help because he threw the gun "to a certain person" as he ran from Jones' truck. The State concluded its cross-examination by introducing appellant's previous convictions: four convictions for aggravated robbery and two for attempted aggravated robbery.

The manager of the temporary employment agency for whom appellant worked also testified. She introduced copies of appellant's time records which reflected that

---

[2]Proof reflected that both McGill and Jones were approximately 6'3" in height and weighed 300 pounds. Appellant's size is not apparent in the record.

on August 3, 1994, appellant worked from 3:30 p.m. until 1:00 a.m.  Finally, appellant recalled Anthony Webster to the stand to provide evidence of the victim's reputation for violence.  Webster also opined that appellant could not have taken the gun to work with him that day, and that he must have brought it back to the game when he changed clothes.

The jury returned verdicts finding appellant guilty of the first degree premeditated murder of Timothy McGill and the attempted first degree murder of Jesse Tate Jones.  It also imposed a $50,000 fine on the attempted murder conviction.  Immediately thereafter, a jury sentencing hearing was held for the murder conviction.  The State sought life imprisonment of appellant without the possibility of parole.  It introduced evidence of two aggravating circumstances: (1) that appellant was previously convicted of one or more felonies involving the use of violence and (2) that the murder was committed during an attempted robbery or attempted murder.  See Tenn. Code Ann. §39-13-204(i)(2), (7) (Supp. 1996).  Appellant presented a substantial amount of evidence in mitigation through the testimony of teachers and relatives.  Although the jury found that both aggravating factors were supported by the proof, it nevertheless sentenced appellant to life in prison.  At a later sentencing hearing on the attempted murder conviction, the trial court sentenced appellant to sixty (60) years as a career offender and ordered that sentence be served consecutively to the life sentence and appellant's previous unserved sentences.

**ANALYSIS**

Appellant first challenges the sufficiency of the indictment charging him with the attempted first degree murder of Jesse Tate Jones.  He contends that the indictment did not contain factual allegations sufficient to state the elements of the offense and urges dismissal of the conviction.  We find the indictment sufficient.

Count two of the indictment states:

And the Grand Jurors aforesaid, upon their oath aforesaid, to [sic] further present that on or about the 4th day of August, 1994, in the State of

7

> Tennessee and County of Maury, that Steve Mason, before the finding
> of this indictment, did unlawfully, intentionally, deliberately and with
> premeditation attempt to kill Jesse Jones, in violation of Tennessee
> Code Annotated 39-12-101, and Tennessee Code Annotated 39-13-202
> . . .

It is well-settled law in this State that, to be valid, an indictment must accomplish three purposes:

> (1) provide notice to the defendant of the precise charges against which he or she has to defend;
>
> (2) notify the trial court of the charges against the defendant so the trial court can enter an appropriate judgment and sentence; and
>
> (3) protect the defendant against double jeopardy.

State v. Trusty, 919 S.W.2d 305, 309 (Tenn. 1996); State v. Haynes, 720 S.W.2d 76, 82 (Tenn. Crim. App. 1986).

In the present case, we find that the indictment meets the three requirements of Trusty. It clearly states the crime with which the appellant is charged, attempted first degree premeditated murder. The indictment also names the victim and the date of the offense. In addition, the indictment avers the culpable mental state of the accused. This is sufficient to notify the appellant of the precise charges. State v. Davis, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987) (holding that an indictment which tracked the statutory language on premeditated murder and named the victim, as well as the date of the offense, is sufficient).

Appellant contends, however, that more factual averments were necessary to constitute a valid indictment, such as how the attempt upon Jones' life was perpetrated. We do not agree. If it were necessary for appellant's defense to know more particular facts about the commission of the offense, a request for a bill of particulars would have been available. See Tenn. R. Crim. P. 7(c); State v. Hicks, 666 S.W.2d 54, 56 (Tenn. 1984) (holding that a bill of particulars is to provide defendant with information about the details of the charge that are necessary to the preparation of his or her defense and to avoid prejudicial surprise at trial).

The indictment also notified the trial court that a judgment and sentence for attempted first degree murder was proper upon conviction. Finally, the indictment protects the appellant from double jeopardy by providing enough detail about the offense to prevent a duplicate prosecution. This issue is without merit.

Appellant next argues that the trial court erred in failing to disqualify the District Attorney's office from prosecuting his case. The record reflects that at his preliminary hearing, the appellant was represented by Larry Nickell of the Public Defender's office. Approximately two months after the preliminary hearing, Nickell left the Public Defender's Office and joined the District Attorney's Office. It is upon these facts that appellant contends the entire office of the District Attorney should have been disqualified from the prosecution.

The trial court held a hearing on appellant's disqualification motion during which the appellant and Nickell testified. That testimony revealed that the appellant talked with Nickell on two occasions. He discussed all aspects of his case with Nickell in preparation for the preliminary hearing. He further asserted he would only have disclosed such information in confidence to his attorney.

Nickell testified that he met with appellant and represented him at the preliminary hearing. He informed the trial court that he had not participated in the prosecution of appellant or divulged any information regarding appellant to anyone in the District Attorney's office. In fact, he had never discussed appellant's case in that office. Additionally, Nickell explained that, upon beginning employment in the District Attorney's office, District Attorney Bottoms instructed him not to have any contact with the prosecutors on any case in which the Public Defender was involved. He declared that he, as well as all the other members of the District Attorney's staff, had scrupulously followed this instruction. No member of the office attempted to speak to him about appellant's case. Appellant's counsel declined to question Nickell at this hearing.

The trial court found that there was no proof that Nickell had participated in or had any contact in any way, shape, form or fashion, with appellant's case. Therefore, he saw no reason to disqualify the entire District Attorney's office.

When this Court reviews a decision by the trial court on disqualification of a district attorney, we may not reverse the decision unless we find that an abuse of discretion has occurred. State v. Tate, 925 S.W.2d 548, 550 (Tenn. Crim. App. 1995). In evaluating whether disqualification is necessary, three considerations are relevant. Id. First, we must consider whether the circumstances establish an actual conflict of interest; if so, there must be disqualification. If no actual conflict is discovered, we must determine whether there is an appearance of impropriety warranting disqualification. Finally, if disqualification is required under either theory, we must consider whether the entire staff of the district attorney's office must be disqualified. Id. Applying this test in appellant's case, we find that it was unnecessary to disqualify the entire District Attorney's office.

It is patently obvious that had Nickell been involved in appellant's prosecution, there would have been an actual conflict of interest requiring his disqualification. See Tate, 925 S.W.2d at 552; State v. Locust, 914 S.W.2d 554, 557 (Tenn. Crim. App. 1995), perm. to appeal denied (Tenn. 1995); State v. Phillips, 672 S.W.2d 427 (Tenn. Crim. App. 1984); State v. Robert West, No. 01C01-9107-CC-00202 (Tenn. Crim. App. at Nashville, March 31, 1992). However, appellant did not make such a contention. Rather, he asserted that Nickell's mere presence in the District Attorney's office while in possession of privileged, confidential information pertaining to appellant warranted disqualification of the entire office. We disagree.

Generally, the entire office of the district attorney need not be disqualified as long as the attorney at issue does not disclose confidences or otherwise participate in the prosecution. Tate, 925 S.W.2d at 556 (citing Mattress v. State, 564 S.W.2d 678, 680 (Tenn. Crim. App. 1977)). In the absence of proof to the contrary, broad disqualification is unnecessary to preserve the appearance of a fair trial or to protect

the appellant's rights. Mattress, 564 S.W.2d at 680. There is absolutely no proof in appellant's case that Nickell shared any information with the prosecutor for the case or that he participated in any capacity in the prosecution of appellant. The trial court did not abuse its discretion in denying appellant's motion to disqualify the entire District Attorney's office.[3]

Appellant also argues that the evidence at trial was insufficient to support the premeditation and deliberation elements of first degree murder.[4] When an accused challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We do not reweigh or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the proof contained in the record, as well as all reasonable and legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1979).

All murder is presumed to be in the second degree and the State bears the burden of proving that the killing was premeditated and deliberate. State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). Statutorily, premeditation is defined as an act done after the exercise of reflection and judgment. It requires that the intent to kill be formed prior to the act itself, although it is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. Tenn. Code Ann. §39-13-202(d) (Supp. 1996). In a similar vein, deliberation requires that the offense be committed with cool purpose, free of the passions of the moment. State v. West, 844

---

[3]We are mindful that a determination on disqualification of the entire office rests in part on a showing that screening procedures were in place at the District Attorney's office in question. State v. Willie Claybrook, No. 3 (Tenn. Crim. App. at Jackson, February 5, 1992). Nickell's testimony demonstrated that measures were taken in this regard which reinforces the trial court's conclusion.

[4]The 1995 statutory amendments to the first degree murder statute delete the element of deliberation. Tenn. Code Ann. §39-13-202(a)(1) (Supp. 1996) (providing that first degree murder is "a premeditated and intentional killing of another"). However, at the time of this offense deliberation remained an element and the State was required to prove its presence.

11

S.W.2d 144, 147 (Tenn. 1992).  See also Brown, 836 S.W.2d at 541.  Premeditation and deliberation are determinations for the jury and may be inferred from the manner and circumstances of the killing.  State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995), perm. to appeal denied (Tenn. 1995) (citation omitted).  The proof at trial supported these elements.

In evaluating the sufficiency of the evidence, we are compelled to consider the evidence in the light most favorable to the State.  Jackson, 443 U.S. at 319.  The State's theory of the case, credited by the jury's verdict, was that appellant formed the intent to kill when he lost his money to the victims, which he believed was a result of their cheating.  This proof of motive is relevant to an inference of premeditation and deliberation.  Bordis, 905 S.W.2d at 222 (quoting 2 W. LaFave and A. Scott, Jr., Substantive Criminal Law §7.7 (1986)).  The State's theory was that appellant decided to murder the victims, went to his home, changed clothes to reduce the likelihood of detection, procured a firearm to accomplish the task, and then returned to the game.  Facts about what the appellant did before the killing which show he was engaged in planning activity also support an inference of premeditation and deliberation.  Id.  See also Brown, 836 S.W.2d at 541 (recognizing that procuring a weapon to commit the homicide is circumstantial evidence of premeditation and deliberation).

Although no quantifiable time is necessary, it is apparent that appellant had ample time to reflect upon the intent to kill.  At least twenty minutes passed after he obtained the gun and before he executed the plan.  We also find that the killing was committed with a cool purpose.  Although the appellant testified that he and McGill exchanged heated words, none of the eyewitnesses testified to such a disagreement.  Their testimony reflected that appellant acted wholly without provocation.  Moreover, appellant's conduct did not correlate with his theory of self-defense, thus yielding credence to the State's theory.  While we cannot infer premeditation and deliberation from appellant's concealment of the weapon after the shooting, concealment does contradict the appellant's theory of self-defense by illustrating fear of detection.  West,

12

844 S.W.2d at 151.  Similarly, appellant's efforts to leave town to avoid law enforcement officials is contrary to a theory of self-defense.  The jury's guilty verdict discredited appellant's theory and demonstrates the ample evidence supporting a finding of premeditation and deliberation.  State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

Appellant's next issue challenges the trial court's ruling on the admissibility of his prior convictions for impeachment purposes.  His contention is two-fold.  First, appellant contends that the trial court applied an incorrect standard when determining their admissibility.  Alternatively, he argues that the prior convictions were similar to the crime on trial and for that reason the convictions should have been excluded.  Although we find that the trial court did incorrectly apply the standard for admissibility, it was not error to admit evidence of the prior convictions.

At the close of the State's proof, the trial court held a hearing to determine whether appellant's prior convictions would be admissible in the event he chose to testify.  The State sought to introduce proof of appellant's four previous convictions for aggravated robbery and two previous convictions for attempted aggravated robbery. After hearing argument, the court ruled:

> The crime on trial is first degree murder and attempted first degree murder, which is a crime of extreme violence.  The similarity to that, in the Court's opinion, and the prior convictions that are listed in the State's notice is the extreme act of violence; that is, that the aggravated robbery is a crime of violence, and suggests violence, so that similarity would be sufficient.

> The relevance.  The Court should analyze the relevance that the impeaching conviction has to the issue of credibility, and I think certainly any crime of violence, especially aggravated robbery and/or homicide, would certainly go to a person's credibility.

> So for those reasons, the Court is going to allow it.

Following the court's ruling, appellant's counsel requested that the court provide the jury with a limiting instruction, which it did.

Tennessee Rule of Evidence 609 sets forth specific procedures to be followed before prior convictions of a criminal accused may be admitted into evidence for

13

impeachment purposes. Prior to trial, the State must provide the accused with written notice of the impeaching conviction(s). Tenn. R. Evid. 609(a)(3). When requested to do so, the trial court must determine that the convictions' probative value on credibility outweigh their unfair prejudicial effect on the substantive issues. Id. This ruling must be given prior to the accused's testimony. Id. See also State v. Farmer, 841 S.W.2d 837, 839 (Tenn. Crim. App. 1992).

In weighing the probative value of prior convictions against their prejudicial effect, the court should analyze two considerations: (1) the similarity between the crime on trial and the crime underlying the impeaching conviction; and (2) the relevance the impeaching conviction has on the issue of credibility. Farmer, 841 S.W.2d at 839 (quoting Neil P. Cohen et al, Tennessee Law of Evidence §609.9 at 288 (2d. ed. 1990)). Often, the similarity between the prior convictions and the offense on trial make admissibility more prejudicial than probative of credibility. State v. Tune, 872 S.W.2d 922, 927 (Tenn. Crim. App. 1993). The greater the similarity between the crimes, the more likely the prejudicial effect, i.e. that the jury would consider the convictions on issues other than credibility. See Neil P. Cohen et al, Tennessee Law of Evidence §609.9 at 376 (3d. ed. 1995); Farmer, 841 S.W.2d at 840.

We may only reverse the decision of the trial court, however, if we find that it abused its discretion in admitting the convictions. Tune, 872 S.W.2d at 927. Here, it is apparent from the court's ruling that it incorrectly applied the proper standard. The trial court erroneously concluded that similarity between the crimes favored admissibility. Although the trial judge employed an incorrect analysis, he nevertheless did not err in admitting the convictions.

Comparing the crime on trial here to the impeaching convictions, we find that they are inherently dissimilar. Appellant was being tried for first degree murder and attempted first degree murder. The impeaching convictions all involved aggravated

14

robbery. Apart from the violence present in both, the elements of these crimes are quite different.

Of far more substantial significance is the probative value the convictions have on the defendant's credibility. Courts frequently admit the impeaching conviction when it is particularly probative of credibility, even if it is identical to the crime being tried. See e.g. State v. Goad, 692 S.W.2d 32, 37 (Tenn. Crim. App. 1985) (admitting robbery conviction for impeachment in trial for armed robbery); State v. Norris, 684 S.W.2d 650, 654 (Tenn. Crim. App. 1984) (admitting armed robbery conviction as impeachment in trial on armed robbery charge); State v. Fluellen, 626 S.W.2d 299, 300 (Tenn. Crim. App. 1981) (permitting armed robbery conviction to be used for impeachment in trial for armed robbery); State v. Bobby Baker, No. 02C01-9511-CC-00347 (Tenn. Crim. App. at Jackson, January 27, 1997) (admitting burglary and theft convictions for impeachment in trial for aggravated burglary); State v. Mario A. Lavender and Eric L. Hobbs, No. 01C01-9506-CR-00202 (Tenn. Crim. App. at Nashville, November 8, 1996) (admitting prior robbery, burglary and theft conviction as impeachment in trial for robbery and theft); State v. Larry Van Davis, No. 01C01-9111-CC-00348 (Tenn. Crim. App. at Nashville, July 23, 1992) (upholding the admission of six prior burglary convictions in a trial for burglary and theft). Appellant's argument that he was prejudiced by the similarity between the prior convictions and evidence that appellant robbed McGill during commission of this offense[5] is without merit.[6]

Here, all of appellant's prior convictions were highly probative of credibility. Each one involved robbery which implicates the critical element of dishonesty. State

---

[5]This proof was circumstantial. McGill had won certain sums of money during the night in the crap game. Vincent Wilson specifically testified that he lost about $160 to McGill that night. Jones testified that McGill should have been in possession of about $200. To support its theory of robbery, the State relied upon the fact that McGill's shorts were found lying beside his body and had been removed prior to his death. The only items found in those shorts were cigarettes, a lighter, and 32 cents in change. No wallet or any sum of cash was discovered on or near the body.

[6]At the sentencing phase, the jury found as an aggravating circumstance that the "murder was committed while the defendant was engaged in committing any *attempted murder*" (emphasis added). The jury did not find that the murder occurred during a robbery as the State also argued.

15

v. Caruthers, 676 S.W.2d 935, 941 (Tenn. 1984), cert. denied 469 U.S. 1197, 105 S.Ct. 981, 83 L.Ed.2d 982 (1985) (citations omitted); Goad, 692 S.W.2d at 37. As a testifying witness who contradicted much of the State's proof, his credibility was crucial. The strong probative value of these convictions outweighs any prejudicial effect.[7] See Caruthers, 676 S.W.2d at 941 (holding that admission of defendant's previous armed robbery conviction was proper in trial for first degree murder). The trial court did not abuse its discretion in admitting the convictions, albeit the result of an incorrect analysis.

Appellant's final issue challenges the imposition of consecutive sentences. Appellant contends that the statutory factors found by the trial court were not supported by the evidence. We affirm the trial court's judgment.

In its ruling, the trial court relied upon three statutory factors in concluding that the sixty (60) year sentence should run consecutive to the jury's sentence of life imprisonment. The trial court found that (1) the defendant is a professional criminal; (3) the defendant is a dangerous mentally abnormal person; and (4) the defendant is a dangerous offender. See Tenn. Code Ann. §40-35-115(b) (1990).

When we review an order of consecutive sentencing, the principles of sentencing review apply. When a defendant complains of his or her sentence, we must conduct a *de novo* review with a presumption of correctness. Tenn. Code Ann. §40-35-401(d) (1990). The burden of showing that the sentence is improper is upon the appealing party. Tenn. Code Ann. §40-35-401(d) Sentencing Commission Comments. This presumption, however, is conditioned upon an affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

A portion of the Sentencing Reform Act of 1989, codified at Tennessee Code Annotated section 40-35-210, established a number of specific procedures to be

---

[7]We also note that the trial court provided a limiting instruction to the jury which further reduced the potential for prejudice to the appellant.

16

followed in sentencing. This section mandates the court's consideration of the following:

> (1) The evidence, if any, received at the trial and the sentencing hearing; (2) [t]he presentence report; (3) [t]he principles of sentencing and arguments as to sentencing alternatives; (4) [t]he nature and characteristics of the criminal conduct involved; (5) [e]vidence and information offered by the parties on the enhancement and mitigating factors in §§40-35-113 and 40-35-114; and (6) [a]ny statement the defendant wishes to make in his own behalf about sentencing.

Tenn. Code Ann. §40-35-210 (Supp. 1996).

Appellant disputes the trial court's finding that appellant was a professional criminal because there was no finding that his criminal acts were "a major source of livelihood." See Tenn. Code Ann. §40-35-115(b)(1) (1990). Although not specifically stated by the trial court, the record supports such a finding. Four of appellant's prior convictions were for aggravated robberies in which he took various sums of money. In at least one of the robberies, appellant took over $1000. Although appellant was employed at the time the instant offenses were committed, the presentence report reflects that appellant's employment history was sporadic. It reflected only brief periods of work for three other employers. The record reflects no other source of income. This leads to a reasonable inference that appellant used his criminal activity as a "major source of livelihood." This factor is appropriate.

Appellant also argues that the trial court erred in finding that he is a dangerous mentally abnormal person. Such a finding requires proof that appellant has been so declared by a competent psychiatrist as the result of an investigation ordered prior to sentencing. Tenn. Code Ann. §40-35-115(b)(3) (1990). Appellant asserts that no such information was before the court and the factor was inappropriately considered. We agree. Without the specific proof required by the statute, this factor may not be applied. State v. Hallock, 875 S.W.2d 285, 295 (Tenn. Crim. App. 1993).

Appellant also challenges the trial court's classification of him as a dangerous offender. As required by the statute, the court found that appellant had little or no regard for human life and that he had no hesitation about committing a crime where

the risk to human life is high. Tenn. Code Ann. §40-35-115(b)(4) (1990). The circumstances of his prior offenses, as well as those of the instant offenses, justify these findings. However, appellant faults this classification because the trial court did not make additional findings in accordance with State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995). Although Wilkerson had not been decided at the time of appellant's sentencing, we find that the Wilkerson factors are present in appellant's case.

Before a court may find a defendant to be a dangerous offender in accordance with the statutory definition, it must also be demonstrated that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offenses committed. Id at 938-39. At the time of trial, appellant was twenty-one years of age. He had been convicted of six felonies. Each robbery was perpetrated at a convenience store or fast food restaurant in which the appellant used a firearm to threaten employees. Such severe and violent criminal acts committed repetitiously so early in adulthood demonstrate that an extended sentence is necessary to protect the public from further criminal conduct by this appellant. Additionally, the sentences reasonably relate to the severity of the offenses. Not only did appellant fatally wound McGill with his first gunshot, he continued to fire at McGill as he ran away, hitting McGill twice in the back. His other victim was also severely wounded. After failing to end Jones' life with the first shot, he again shot Jones in the back of the head as he lay on the ground. Appellant's cruelty and cold-blooded brutality demonstrated by these offenses indicate that the sentences are reasonable.

## CONCLUSION

Upon a thorough review of the record, we find no error requiring reversal. Appellant's convictions and sentences are affirmed.

_____
William M. Barker, Judge


_____
Paul G. Summers, Judge


_____
Joe G. Riley, Judge