STATE of Tennessee, Appellee,

v.

Charles Larry TUNE, Appellant.

Court of Criminal Appeals of Tennessee,
at Nashville.

Feb. 9, 1993.

Permission to Appeal Denied July 6, 1993.

Permission to Rehear Denied Aug. 23, 1993.

Barry B. White, Lewisburg, for appellant.

Charles W. Burson, Atty. Gen. & Reporter, Bettye Springfield, Asst. Atty. Gen., Nashville, Mike McCown, Dist. Atty. Gen., Jack Bomar, Asst. Dist. Atty. Gen., Fayetteville, for appellee.

## OPINION

PEAY, Judge.

The defendant was charged with and convicted of malicious shooting and first degree murder, for which he received sentences of six years and life imprisonment respectively. These sentences were set to be served consecutively.

In this appeal as of right, he raises four issues. He first challenges the sufficiency of the evidence regarding the murder conviction. In his second and third issues the defendant contends that the trial court erred in holding that evidence of two September 1989 drug convictions and a 1973 burglary conviction would have been admissible should he have chosen to testify. Finally, the defendant complains that the trial court erred in communicating with the jury off the record through the jury officer and outside the presence of the defendant and his counsel. After careful review of the record, we find these issues to be without merit, and accordingly, we affirm the judgment of the trial court.

It is uncontested that on the evening of March 20, 1989, shortly after 7:00 p.m., the defendant shot Ernest Gregg at Hamler's Garage, which the victim had been renting for three months for the purpose of working on race cars. According to the testimony of both the victim's wife and his racing partner, the victim worked at the garage most weekends and many weeknights between January and March of 1989.

On the night in question, Gregg and Kurt Robertson, his partner, were working inside the garage when, according to Robertson, the defendant entered the well-lit building through one of two open garage doors, carrying a shotgun. Robertson recalled that though the defendant had held the shotgun loosely at his waist, he had pointed it in the direction of both Robertson and Gregg and speculated aloud as to whether the gun would fire properly or not. This witness added that there had been further conversation between Gregg and the defendant, during which the defendant had allegedly said, "I ain't gonna kill you. I ain't gonna shoot you.... Ain't no reason, and ain't no cause". Robertson related that at that point he had thought that the whole episode would "blow on over" despite the defendant's keeping the gun trained on Gregg.

However, moments later the defendant asked Gregg if Robertson was his "yes man", to which Gregg responded "What?" According to Robertson, the defendant then became angry and, with the gun still pointed at Gregg, said, "I'm just going to go ahead and shoot you now". Robertson testified that at this threat Gregg moved toward the front of

the race car parked inside the garage and picked up from the hood a white towel in which a pistol was concealed. The witness acknowledged that Gregg had sometimes brought a gun with him to the garage but had always kept it wrapped in a towel. He maintained that Gregg had been hit with a shotgun blast while waving the towel around trying to get the pistol unwrapped.

Since Gregg had been standing directly between Robertson and the defendant, Robertson could not testify to actually having seen the defendant shoot Gregg. However, he did state with certainty that the first shot had been fired from a shotgun. He further stated that the shotgun blast had been followed by several pistol shots and two more shotgun blasts, one of which had come from inside the garage slightly injuring him, and one of which had sounded to him as if it had come from outside the building. According to Robertson's estimation the defendant and the victim were some eight feet apart when the shotgun was first fired.

Following this exchange, the defendant left the scene, and Robertson drove away in a truck toward the victim's home, located approximately one-half mile from the garage. Robertson added that when he had left, the victim had been lying on the floor in the doorway which connected the garage bays to an adjoining office. Upon arriving at Gregg's home, he told the victim's wife that Gregg had been shot and that she should call for help. He found a 20–gauge shotgun in a closet and returned with it to the garage. Finding no one on the premises other than the motionless victim, Robertson went for the police.

Also testifying for the State was Chapel Hill Police Chief Jackie King. He stated that he had responded to a call to Hamler's Garage at approximately 7:15 p.m. on the evening in question. Arriving on the scene shortly before Robertson returned, he observed the victim lying face down in the doorway. Though he took possession of the loaded 20–gauge shotgun brought to the garage by Robertson, he stated that later the same evening the police concluded that the weapon had not been fired that night.

Detective Dale Watkins of the Marshall County Sheriff's Department testified that on March 20th he responded to a call to Hamler's Garage at about 7:30 or 8:00 p.m. There he found the victim lying face down on the floor and determined that the victim was already dead. In addition, he discovered a 38–caliber pistol with six spent cartridges wrapped in a bloody towel underneath the victim's body. According to this witness the gun was not visible until the body was turned over, at which time a shotgun shell wad fell out of the victim's shirt. Watkins further testified that he and a second detective recovered three 12–gauge spent shotgun shells from the scene, two from inside the garage and one from the other side of the road at the edge of the defendant's driveway. They also recovered shells of the same size and make from the defendant's house and truck the next day; however, a 12–gauge shotgun was never found in connection with the incident. According to the detective the defendant was not present when he arrived on the scene but turned himself in one week later.

At trial Vicki Gregg, the victim's wife, gave essentially the same account as Robertson concerning events following his arrival at her house after the shooting. According to her testimony she arrived at the scene shortly after Robertson and the police chief. Furthermore, she described a disagreement of sorts between the defendant and her husband which had occurred at Hamler's Garage two weeks prior to the shooting. On the afternoon of March 5th the defendant, who lived in a trailer across the road and some eighty yards from the garage, had stood on his porch and complained loudly of the noise coming from a three-wheeler ridden by the victim's four-year-old son. The victim's wife stated that after they had attempted to muffle the noise, the child had resumed riding in the area around the garage. A short while later the defendant had come out into his yard, fired a shotgun in the air, and according to Gregg's wife had said, "If you don't stop making so much racket, you are going to have to move your furniture in that shop and live in it, or I'm going to burn that M–F"ing shop to the ground". Robertson had also been present at the garage that afternoon and his testimony was consistent with Vickie

Gregg's account. During her testimony Ms. Gregg also identified the pistol found underneath the victim's body as the same one which he had often taken to the garage following the events of March 5th.

According to the medical examiner's testimony the victim sustained neck and shoulder wounds from a single shot fired at close range and died from resulting arterial bleeding. Approximately forty pellets were removed from the victim's body, and alcohol and drug screens performed on the victim rendered negative results.

The defendant did not testify and presented no other proof at trial.

■ In his first issue the defendant challenges the sufficiency of the evidence for the first degree murder conviction. The defendant argues that the evidence presented at trial was insufficient to support a finding that the killing was intentional and premeditated, as required by Tennessee law in effect at the time of the incident. T.C.A. § 39–2–202(a) (1982). Rather, he contends that he was acting under passion and shot the victim in self-defense.

■ When an accused challenges the sufficiency of the convicting evidence, this Court must review the record to determine if the evidence adduced at trial is sufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt. T.R.A.P.. 13(e). We do not reweigh or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978).

■ It is clear in Tennessee law that the existence of premeditation and deliberation is a question of fact which may be inferred by the jury from the circumstances of a homicide. *See State v. Brown,* 836 S.W.2d 530, 541–42 (Tenn.1992). While willful killing with a deadly weapon is not sufficient by itself to support an inference of premedita-

tion, there were other circumstances before the jurors from which they could infer the existence of both premeditation and deliberation in this defendant's mind. *See Meazel v. State,* 500 S.W.2d 627, 629 (Tenn.Crim.App. 1973).

On the evening in question, the defendant approached the victim and his partner, pointed a loaded shotgun at them, and speculated as to whether his gun would fire properly. According to eyewitness testimony the defendant first said he was not going to shoot the victim, then engaged in further conversation, and finally stated his clear intention to shoot the victim. All of this took place before Gregg moved toward his concealed weapon. Moreover, the defendant shot Gregg at close range while Gregg was still trying to unwrap his pistol and, thus, before he could effectively brandish it at the defendant.[1] Testimony from both the victim's wife and his partner regarding threats made by the defendant two weeks prior to the shooting could be credited by the jury as further evidence of the defendant's premeditated intent. *See State v. Bullington,* 532 S.W.2d 556, 560 (Tenn.1976).

In *Brown,* 836 S.W.2d 530, the Tennessee Supreme Court reversed a conviction for first degree murder stemming from child abuse, holding that deliberation is distinct from premeditation and cannot be formed in an instant. The Court characterized a deliberate act as one performed with a cool purpose and after some period of reflection. *Brown,* 836 S.W.2d 530, 540.

The facts of the present case distinguish it from *Brown* in several respects. In *Brown* there was no evidence of either cool purpose or reflection by the defendant prior to killing the child. Rather, the evidence suggested that the defendant had been operating under extreme passion since death had resulted from a series of repeated blows inflicted by the defendant during a prolonged family fight. Conversely, in the present case there was evidence from which the jury could infer that the defendant deliberated prior to ap-

---

1. The defendant's brief extracts small portions of Robertson's testimony on cross-examination which seem to indicate that Gregg openly brandished his weapon prior to being fired upon. However, when read in context, the eyewitness statements make it clear that the pistol was still wrapped in the towel when the victim was shot.

proaching the victim at Hamler's Garage and that he further considered his intention after confronting Gregg and Robertson with the loaded shotgun.

The defendant's contention that he was acting under passion at the moment of the shooting, and that such passion precluded a finding of premeditation, is not supported by the evidence. Numerous cases have defined passion as "any of the human emotions known as anger, rage, sudden resentment or terror which renders the mind incapable of cool reflection". *Bullington*, 532 S.W.2d 556, 560. *See also Drye v. State*, 181 Tenn. 637, 184 S.W.2d 10, 13 (1944). While there was testimony that the defendant became angry just prior to the shooting, there was no showing that his "reason was dethroned by anger". *Bullington*, 532 S.W.2d 556, 560.

From the evidence presented at trial, a reasonable jury could have concluded that the defendant had contemplated killing Gregg well before the shooting occurred. He arrived at the garage carrying a loaded shotgun and pointed it at Robertson and Gregg. His conjecture regarding the gun's operation, followed by assurances that he would not kill Gregg, could have been credited by the jury as further reflection by the defendant. Moreover, the defendant was calm enough to give Robertson the impression that the incident would pass. The only indication of any agitation on the part of the defendant prior to the shooting was Robertson's testimony that the defendant had gotten angry after asking Gregg if Robertson was his "yes man". A reasonable trier of fact could have found such an exchange to be an insufficient basis for rendering the defendant incapable of acting with the cool purpose and deliberate intention required to establish first degree murder. *See Bullington*, 532 S.W.2d 556, 559. *See also Wilson v. State*, 548 S.W.2d 323, 324 (Tenn.Crim.App. 1976).

A similar conclusion was reached by the Court in *Rye v. State*, 532 S.W.2d 941 (Tenn. Crim.App.1975), wherein the defendant had placed a loaded gun in his car and had then become angry when his wife refused to ride with him. Carrying his gun, the defendant followed his wife as she tried to escape, assaulted her, and fired upon her several times, injuring her and killing her father in the process. In affirming his conviction, the court stated: "The jury was justified in finding that his reason was not overcome by passion. That he was filled with malice and anger is obvious; but there is more than sufficient evidence to support the State's position that murder was premeditated and that Rye was capable of premeditation". *Rye*, 532 S.W.2d 941, 942. *See also State v. McAfee*, 784 S.W.2d 930, 932 (Tenn.Crim. App.1989).

The defendant's assertion that he fired on the victim in self-defense was also a matter for the jury's consideration. *See State v. Venable*, 606 S.W.2d 298, 301 (Tenn. Crim.App.1980). They were justified in not crediting his theory since, according to eyewitness testimony, the victim did not move towards the concealed weapon until after the defendant had announced his intention to kill him. Furthermore, at the time the victim was shot, he was still trying to unwrap the weapon from the towel and had not yet fired on the defendant. From this evidence a rational jury could have concluded that the defendant had no reason for assuming his life was in imminent danger when he fired upon the victim.

Where the defendant has challenged the sufficiency of the evidence, this Court will not disturb a verdict of guilt unless the facts contained in the record along with any inferences which may be drawn from those facts are insufficient, as a matter of law, for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn.1982). Based upon the facts in the record and the inferences which could be drawn therefrom, the jury could and did find that the killing of Ernest Gregg was done with premeditation. The defendant has failed to demonstrate why the evidence is insufficient to support the jury's verdict.

Through his second and third issues the defendant challenges the court's ruling that his prior felony convictions for drug possession and third degree burglary would have been admissible on cross-examination

for impeachment purposes, should he have elected to testify. In September of 1989, the defendant pled guilty to felony possession of Schedule II and Schedule IV controlled substances. In November of 1973, he was convicted of third degree burglary, also a felony offense.

Under Rule 609(a)(3) of the Tennessee Rules of Evidence, a crime committed by the accused which is punishable by death or imprisonment in excess of one year may be admissible in order to attack his credibility, regardless of whether the crime involved dishonesty or false statements, as long as the conviction's probative value as to credibility outweighs its unfair prejudicial effect as to the substantive issues.[2] At the jury-out hearing the trial court rejected counsel's unsupported assertion that it would be prejudicial for the jurors to learn of the defendant's prior convictions. Defense counsel did not suggest that the drug offenses were similar in nature to the crime of which the defendant stood accused, a frequent basis for arguing that the admission of prior convictions is more prejudicial than probative of credibility. *See State v. Crank,* 721 S.W.2d 264, 266 (Tenn.Crim.App.1986).

Prior to the adoption of our rules of evidence, the Tennessee Supreme Court had chosen to follow the similar federal rule. The Court declined to mandate specific guidelines to be used by trial judges in weighing the probative value of convictions against their prejudicial effect, choosing instead to leave the matter to the discretion of the trial judge who is in the best position to make such an evaluation. *See State v. Sheffield,* 676 S.W.2d 542, 548–9 (Tenn.1984). In this case the trial court found that the probative value of the felony drug convictions on the defendant's credibility sufficiently outweighed any unfair prejudicial effect on the substantive issues. Such a determination was within the court's discretion, and we see no reason to disturb this finding. Though the court gave little explanation for its ruling, Rule 609(a)(3) does not require such. Accordingly, we overrule the defendant's second issue.

■ The trial court's decision to allow introduction of the prior burglary conviction for impeachment purposes is subject to Rule 609(b), because of the time span involved since the date of the defendant's release for this offense. According to the rule, evidence of such a conviction is only admissible if there is sufficient notice and if the court determines that "the probative value of the conviction, supported by specific facts and circumstances, substantially outweighs its prejudicial effect". Tenn.R.Evid. 609(b).

The trial court observed that since the victim was unavailable to give his version of events, the defendant's credibility was particularly critical and should be subject to impeachment upon this defendant's testifying at trial. The court considered several factors in finding that the probative value of the conviction substantially outweighed the prejudicial effect. The court allowed that standing alone, it would probably not be admissible. However, when evaluated in light of the two more recent felony drug convictions, the burglary conviction seemed part of a continuing pattern of criminal behavior. The court also observed that burglary is a crime involving false dealings and dishonesty and, therefore, is particularly probative regarding credibility. Such a determination is consistent with a number of other cases in which burglary convictions have been ruled probative on the matter of credibility. *See Crank,* 721 S.W.2d 264, 266; *State v. Miller,* 737 S.W.2d 556, 559 (Tenn.Crim.App.1987); *State v. Bowers,* 673 S.W.2d 887, 889 (Tenn.Crim.App.1984).

While we don't necessarily agree with the trial court's finding concerning a continuing pattern of criminal behavior, other facts and circumstances considered by the trial court support its determination that the probative value of the burglary conviction substantially outweighed its prejudicial effect. We cannot say that the court erred in ruling that the conviction would be admissible for impeachment purposes. Accordingly, the defendant's third issue is overruled.

■ The final issue raised by the defendant is that the trial court erred in communicating with the jury via the jury officer, off

---

**2.** This rule is subject to certain time limitations. Tenn.R.Evid. 609(b).

the record and outside the presence of the defendant and his counsel. The defendant contends that such communication violates his constitutional rights to confront witnesses, be assisted by counsel, and be present at all stages of his trial. He further notes that the latter right is also guaranteed by Tenn. R.Crim.P. 43.

Given the importance of judicial impartiality and fairness in appearance as well as in fact, it is generally considered improper for the trial judge to communicate with jurors off the record and outside the presence of counsel. *See also State v. Smith,* 751 S.W.2d 468, 472 (Tenn.Crim.App.1988); *State v. Mays,* 677 S.W.2d 476, 479 (Tenn. Crim.App.1984). When such ex parte communications relate to an aspect of the trial, the trial judge should usually disclose the communication to counsel for all parties. *Rushen v. Spain,* 464 U.S. 114, 119, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983).

Nevertheless, the Tennessee Supreme Court has held in civil cases that these communications should be subject to a harmless error analysis. *Guy v. Veith,* 754 S.W.2d 601, 605 (Tenn.1988); *c.f. Rushen,* 464 U.S. 114, 118, 104 S.Ct. 453, 455. A reversal is necessary "where a timely complaining party shows specific prejudice, or where, owing to the nature of the ex parte communication, the reviewing court is unable to determine whether the action was actually harmless". *Guy,* 754 S.W.2d 601, 605. The United States Supreme Court has held that the question of whether the failure to disclose the communication was prejudicial can generally be resolved in a post-trial hearing. *Rushen,* 464 U.S. 114, 119, 104 S.Ct. 453, 456. The inability of the reviewing court to determine from the record whether the communication was actually harmless requires a reversal. *Guy,* 754 S.W.2d 601, 604–5.

Most courts have declined to adopt a per se reversible error standard such as was announced in *McBride v. Allen,* 720 S.W.2d 459, 465 (Tenn.App.1979), wherein the Court held that ex parte conversations between judge and jury constitute reversible error.

*Guy,* 754 S.W.2d 601, 604. Through *Estate of Depriest v. Allen,* 733 S.W.2d 74, 77 (Tenn. App.1976), the court stated "that instructing the jury outside the presence of counsel where the supplemental instructions are given in open court and all the supplemental proceedings are on the record is not per se reversible". Quoting *Wade v. Ordway,* 60 Tenn. 229, 232 (1872), the court in *Depriest* suggested that requiring strict observance of the prohibition on judge-jury communications outside the presence of counsel "would be to uphold the letter of the rule of practice, but to disregard its spirit and principle". *Depriest,* 733 S.W.2d 74, 77.

In *Mays,* 677 S.W.2d 476, 478–79, the jury submitted a written question to the judge concerning parole eligibility and maximum sentences, to which the judge replied in writing. While the answer was substantively correct, some of the details given were not proper for consideration by the jury. Nevertheless, the Court determined that the response did not affect the verdict and, therefore, did not prejudice the defendant. Accordingly, the communications, though improper, were deemed harmless error. *Mays,* 677 S.W.2d 476. In criminal cases where the issue of judge-jury communications was raised, courts have generally ruled consistent with *Depriest* that slight departures from what is considered proper procedure, though discouraged, do not require reversal.

The Sixth Circuit applied a more rigorous standard pursuant to Fed.R.Crim.P. 43 [3] yet reached the same conclusion in *United States v. Reynolds,* 489 F.2d 4 (6th Cir.1973), *cert. denied,* 416 U.S. 988, 94 S.Ct. 2395, 40 L.Ed.2d 766 (1974), a case factually similar to the present one. In that case, the jury inquired of the judge as to the defendant's height. This question was asked once deliberations were underway and was orally communicated to the judge by way of the bailiff, who relayed the question to the judge's secretary, who then passed it on to the judge. The judge's answer, declining to furnish this information, was given to the jury using the same process. The court's assessment of

---

**3.** Similarly to Tenn.R.Crim.P. 43, this rule deals with the presence of a defendant at various stages of the proceeding against him or her.

whether reversible error had been committed was based on whether there was "any reasonable possibility of prejudice". *Reynolds,* 489 F.2d 4, 7–8 (quoting *Wade v. United States,* 142 U.S.App.D.C. 356, 441 F.2d 1046, 1050 (1971)). Notwithstanding the convoluted procedure by which the question was asked and answered, as well as the absence of the defendant and his counsel, the reviewing court found no reasonable possibility of prejudice in the judge's answer and, accordingly, ruled any error harmless. *Reynolds,* 489 F.2d 4, 8. *See also United States v. Arriagada,* 451 F.2d 487, 489 (4th Cir.1971), *cert. denied,* 405 U.S. 1018, 92 S.Ct. 1300, 31 L.Ed.2d 481 (1972).

In the present case affidavits submitted by defense counsel and the court reporter allege that on two separate occasions the judge "gave an answer" to the jury officer's questions from the jury as to whether unanimity was required on the verdict and on the elements of the charged crime. However, the affidavits do not indicate the nature of the judge's answer nor what the jury officer told the jury, and at the motion for a new trial when this issue was first raised, defense counsel advanced no proof as to what may have been said. Neither the court reporter nor the jury officer testified as to the nature of the exchange. Furthermore, there were no affidavits from any of the jurors disclosing supplemental or even repeated instructions communicated to them in response to their questions. Lastly, we note that there was no allegation of prejudice caused by the judge's remarks.

The record of the hearing reveals that the trial judge himself stated that after twenty-two years on the bench he "certainly knew better than to answer any questions of the jury". He added that according to his best recollection, his response to the jury officer's questions was "to tell the jury just to read the instructions.... I never give [the jury officer] the answer to go back and tell [to the jury]. I've never done that since I have been [a] [j]udge". He further stated that if the jury was still unclear, his practice was to reconvene counsel and the jury in open court, in accordance with proper procedure. The judge's explanation of what happened in this case was not refuted, even though defense counsel by his own admission was present during at least one of the exchanges. As was stated by the Tennessee Supreme Court well over one hundred years ago, the judge's statement must be taken as "the most trustworthy information to be had, on the general principle that every presumption is in favor of the integrity and uprightness of a high judicial officer". *Depriest,* 733 S.W.2d 74, 77 (quoting *Wade,* 60 Tenn. 229, 233).

The defendant's objection to the ex parte communications is grounded partly in the assumption that communication between the judge and jury via the bailiff is open to misunderstanding of both the question and the answer, thereby potentially prejudicing the defendant. However, in this case the question was clearly stated, and according to the trial judge, his response was limited to instructing the jury to reread the instructions. Such is an equally clear answer.

Contrast the present case with *United States v. Schor,* 418 F.2d 26, 29 (2nd Cir. 1969), wherein the jury submitted two written questions to the judge to which he responded in writing and outside the presence of counsel. While the first communication was found to constitute harmless error, the second question was said to have been "incomprehensible" and "manifestly unclear" in the reviewing court's opinion. *Schor,* 418 F.2d 26, 29–30. Because the complete lack of clarity in the question made it impossible to determine whether the trial judge's responding "no" without any clarification might have affected the jurors' deliberations, the Second Circuit held these communications to be prejudicial and, therefore, not harmless error. *Schor,* 418 F.2d 26, 30. Conversely, there has been no showing in the present case of any such lack of clarity in the jurors' questions or the judge's response to them.

Finally, it is noteworthy that the issue of improper communications was first raised at the motion for new trial, despite defense counsel's affidavit which clearly states that he overheard one exchange between the judge and court officer and was informed of the second exchange shortly after it occurred.

The Court in *Guy* held that the failure of counsel to object to similar communications in a timely manner constituted waiver of the right to complain about them in a later proceeding. *Guy*, 754 S.W.2d 601, 605. The Court referred to a number of cases which stand for the proposition that when a defendant or defense counsel are aware of such communications and fail to object prior to the jury returning a verdict, the issue is deemed waived on appeal. *Guy*, 754 S.W.2d 601, 603. A party cannot witness misconduct on the part of the court, await the result of the verdict, and then, if it is against him or her, object to the alleged misconduct. *See, e.g., McKnelly v. Sperry Corp.*, 642 F.2d 1101, 1108 (8th Cir.1981). Arguably, the defendant in the present case has waived his right to complain since he made no timely objection to the communications. However, even if this issue were not deemed waived, we find that the defendant has not only failed to show that the judge's responses were inappropriate, but he has also failed to demonstrate any prejudice resulting from those responses. We, therefore, find the defendant's fourth claim to be without merit.

Having considered all of the issues raised by the defendant and finding them to be without merit, we affirm his convictions for first degree murder and malicious shooting.

WADE and TIPTON, JJ., concur.