# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 8, 2011

## STATE OF TENNESSEE v. CHARLES STEVEN SHIVERS A.K.A. SCOTT KEVIN MCNEIL

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008-C-2587      J. Randall Wyatt, Jr., Judge**

---

**No. M2009-02079-CCA-R3-CD - Filed December 19, 2011**

---

The defendant, Charles Steven Shivers, was convicted of attempted first degree murder, a Class A felony, and especially aggravated robbery, a Class A felony. He was sentenced to twenty-five years at thirty percent for the attempted murder and to a consecutive eighteen years at one hundred percent for the especially aggravated robbery, for a total effective sentence of forty-three years. On appeal, the defendant claims that the evidence is insufficient to support his convictions and that the trial court erred by denying the defendant's pretrial motion to suppress the victim's identification testimony, erred by having an *ex parte* meeting with a juror during deliberations, and erred in imposing consecutive sentences. After carefully reviewing the record and the parties' arguments, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Dawn Deaner, District Public Defender; Emma Rae Tennent (on appeal), Jonathan F. Wing and Sunny Eaton (at trial), Assistant Public Defenders, for the appellant, Charles Steven Shivers a.k.a. Scott Kevin McNeil.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Benjamin Ford, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant was indicted by a Davidson County Grand Jury on August 15, 2008,

on charges of attempted first degree murder and aggravated robbery stemming from his alleged participation in a drug-related robbery in which the victim, Artenner Mann, survived after being shot thirteen times. At the defendant's trial on April 15-17, 2009, the victim took the stand and testified as follows:

On January 31, 2008, the victim received a call from Lamont Butler, a friend of his, who requested that he supply two ounces of crack cocaine. The buy was supposed to be for a third party – the defendant – on whose behalf Lamont Butler had previously arranged cocaine purchases. On at least two occasions, the victim had previously met the defendant in the company of Lamont Butler during transactions involving the purchase of crack cocaine. During these transactions, the victim had the opportunity to view the defendant for several minutes and engage him in some brief conversations.

The victim was uncomfortable dealing with the defendant and initially refused to conduct any transaction without Lamont Butler being present. However, Mr. Butler assuaged the victim's concerns, promising, "you cool, I never get you in a situation, have anything harm you or anything like that." The victim agreed to the transaction, and the defendant called him to negotiate the terms of the deal. After asserting that he could not afford two ounces, the defendant negotiated the deal down to one ounce, for a price between $1500 and $1700 dollars (with the exact price to be determined later). They agreed to meet on Harding Place at a nearby Mapco.

At some point prior to the victim's arrival, he smoked some marihuana. When the victim arrived, the defendant contacted the victim by phone and refused to conduct the transaction at that location, accusing the victim of wanting to rob him. The victim drove some distance to some apartments located at 550 Harding Place and pulled in next to some bushes. The defendant followed in a white SUV and pulled in on the right side of the victim's car. After some additional wrangling by phone over the details and location of the transaction, the defendant exited his vehicle and entered the passenger's side of the victim's vehicle. The victim pulled out some scales and weighted out seventeen grams of crack cocaine. The defendant reached out and took the cocaine with one hand while simultaneously drawing out a gun with his other hand. The defendant backed up out of the car and told the victim not to move. The victim complied but then felt himself being shot. The victim testified that he was shot multiple times by two individuals, one from either side of his car. After the shooting finally stopped, the defendant asked the victim "where [is] the money," and the victim felt a second, lighter-skinned individual searching through his clothing, after having opened the driver's side door of his car.

A short time later, the defendant's SUV pulled out of the parking lot. The victim got out of his car, crawled to a nearby house, and sought aid, but no one would open the door.

-2-

He then crawled out into the street, where a Caucasian male with curly hair (later identified as Mr. James Phipps) assisted him. When he arrived at the hospital, he learned that he had been shot thirteen times, including shots to every limb, and had suffered severe damage to his face, right arm, left arm, and right foot. The victim testified that as a result of his injuries, he was presently unable to lift more than ten pounds with his right arm, had ongoing nerve damage to the left side of his face, and had no feeling in his right foot. The victim explained that he continued to bear numerous scars as a result of his wounds.

The victim identified the defendant in open court as the man with whom he had met on prior occasions and as the man who had shot him on the night in question. The victim stated that he had between $2500 and $3000 on his person at the time he was shot, but that this money was missing at the time when he was released from the hospital. On cross-examination and redirect, the victim testified concerning his lengthy criminal record including convictions for possession of marihuana, possession of cocaine, aggravated assault, domestic assault, gambling, and various failures to appear in court.

In addition to the testimony of the victim, the State presented the testimony of Dr. Oscar Guillamondegui, a medical expert in the treatment of traumatic injuries, who was familiar with the victim's medical records and who treated the victim following the shooting. Dr. Guillamondegui testified concerning the extent of the victim's wounds and the extensive medical treatment that was required to treat his injuries. Dr. Guillamondegui testified that the victim would likely suffer lifelong neurological damage, functional loss of his right arm below the elbow, and sensory loss and functional loss in his face. Dr. Guillamondegui further testified that, without immediate medical treatment, the victim would have died of his wounds.

Next, the State presented the testimony of two officers who played minor or background roles with respect to the investigation. Kevin Coleman, of the Metro Nashville Police Department, testified that he was working traffic enforcement on January 24, 2008, several days prior to the crime, and had pulled over the defendant for speeding while driving a white 1992 Ford Explorer SUV. Tracy Gatwood of the Metro Nashville Police Department, who worked in the computer crimes lab, testified that he had performed a computer analysis of the victim's cell phone, and authenticated a list of contact information that he had obtained from the victim's phone.

Following this testimony, Lamont Butler took the stand. Mr. Butler testified that he contacted the victim on January 31, 2008, and informed the victim that he knew someone (the defendant) who wanted to buy crack cocaine. After talking with the victim, he called the defendant, who came by his house driving a white SUV. Mr. Butler got into the vehicle, placed an additional call to the victim arranging the transaction, and then got out as the

defendant drove off to meet the victim. Mr. Butler testified that sometime later, he received a phone call from his cousin telling him that the victim had been killed. Sometime later, Mr. Butler ran into the defendant and asked him about the incident. Mr. Butler stated that the defendant had stated to him that the drugs that the victim had sold him had been "wet" (meaning "no good") and that the defendant had shot the victim.

Mr. Butler stated that there was no particular reason he had not gone with the defendant on the drug buy that evening. When first contacted by the police, Mr. Butler claimed to have initially lied (out of fear for his safety) concerning both his and the defendant's involvement in the transaction, but he claimed that he later recanted his story, told the truth, and pointed the police in the direction of the defendant. During his testimony, Mr. Butler identified the defendant's cell phone number and pointed out where that phone number appeared in the records the police had extracted using the victim's cell phone. Mr. Butler also corroborated the victim's testimony concerning a prior drug deal involving all three men that had occurred at a hotel. On cross-examination and redirect, Mr. Butler testified regarding his prior inconsistent statements to police; his lengthy criminal record including convictions for criminal simulation, criminal impersonation, and theft; and to the fact that he had been told by police that he would not be prosecuted for arranging the drug transaction if he testified truthfully.

Officer Scott Sulfridge, a detective for the Nashville Police Department, testified that he arrived at the crime scene on the night in question after the victim had been loaded into an ambulance, examined some bloody clothing that had been found in front of an apartment building, and interviewed some witnesses. One of these witnesses, Mr. James Phipps, mentioned that earlier as he was driving through the area he saw a black male leaning over into a vehicle and then saw five or six bright flashes – like muzzle flashes. The officer claimed Mr. Phipps told him there was a second individual standing next to a white SUV parked close to the vehicle. Mr. Phipps pulled into the parking lot of a nearby Mapco and then saw the same white SUV pass him at a high rate of speed, fleeing the scene. The officer testified that Mr. Phipps told him that he then returned to the parking lot at 550 Harding Place, located the victim, and was preparing to call 911 when a patrol car arrived.

Next, the State presented the testimony of Detective Brad Corcoran, a Homicide Detective who was contacted on the night of the shooting so that he could view the crime scene in case the victim subsequently died. Detective Corcoran described various evidence found at the crime scene including blood and bullet holes in the victim's vehicle, spent shell casings, and a trail of blood that led from one of the vehicles to a nearby apartment building. He sat in on the interview with Mr. James Phipps, who claimed to have seen two black males standing next to the victim's vehicle with one of the males firing into the vehicle several times. Detective Corcoran claimed Mr. Phipps had stated that the males drove away in a

-4-

white Mercury Mountaineer SUV with tinted windows.

The State called Mr. Juan Abunders, who lived in an apartment at 550 Harding Place on January 31, 2008, and who testified that he was cooking his supper on the day in question when he heard four or five noises like a car backfiring. About five minutes later, he looked outside his window and saw a person crawling on the ground toward his door. He testified that he called 911. The person on the ground reached his house and began banging on the door for several minutes while making noises as though he was trying to talk. Mr. Abunders eventually opened his door when a police officer arrived.

Mr. James Phipps took the stand and testified that he had just driven out of Mapco on the night of the crime when his attention was captured by what appeared to be muzzle flashes as he drove past a particular vehicle. The passenger-side door of this vehicle was open, and he was able to make out the silhouette of an individual leaning over the front seat firing into the vehicle with one leg still on the ground outside the car. He also saw a white SUV parked near the victim's vehicle with another individual standing near the passenger's side. Mr. Phipps turned around and circled back to the scene. When he arrived, he found the vehicle that he had seen earlier empty with both front doors open. He also heard a man on the ground grunting for assistance. He was about to call 911 when several police cars arrived.

Officer Danny Orr, who assisted with the processing of the crime scene on the night of the shooting, authenticated a number of photographs taken at the crime scene, which were entered into evidence. Sergeant Orr also identified two plastic bags containing white powder consistent with cocaine that were recovered from the victim's coat pockets, three .380 shell casings recovered from the scene, another three .380 shell casings recovered from the victim's car, one bullet recovered from the scene, and two cell phones recovered from the victim's vehicle. Thereafter, Officer Isaac Marinez, who worked in the Nashville Metropolitan Police Department property and evidence division, testified concerning certain storage and chain-of-custody issues pertaining to the evidence.

Detective Rodney Harbin of the Nashville Metropolitan Police Department testified that on January 31, 2008, he responded to a call of a shooting at 550 Harding Place. Paramedics were already assisting the victim on the scene, and he followed the ambulance transporting the victim to the hospital. When he arrived at the hospital, he collected the victim's ID and received a spent round from a paramedic that was represented to him as coming from the victim. From the stand, Detective Harbin identified the victim of the crime as Artenner Mann. Detective Harbin testified that he later returned to the scene and spoke with Mr. Phipps.

The following day, Detective Harbin returned to the hospital and was able to

communicate with the victim, who was heavily sedated. The victim indicated to him through the use of hand signals that he knew who was responsible for his shooting and that the person's name was Butler. Later that same day, he returned to the victim's vehicle and recovered a cell phone. His follow-up investigation, including data downloaded from the victim's cell phone, led him to Gary Lamont Butler, whom he called in for an interview. During that interview, Mr. Butler gave Detective Harbin information that was inconsistent with what Detective Harbin had been told by the victim. When confronted with those inconsistencies, Mr. Butler told the detective about the defendant and gave the detective two different phone numbers for the defendant, one of which matched a number that was both incoming and outgoing on the victim's cell phone on the evening of the shooting – including two calls that were made within ten minutes of the crime. Based on this information, Detective Harbin prepared a photographic lineup including the defendant and five other individuals with similar physical characteristics. The detective returned to the hospital. After going over certain identification guidelines with the victim, he showed the lineup to the victim. The victim immediately identified Charles Shivers, the defendant, as the person to whom he had tried to sell drugs, and the person who had shot him. Following this testimony, the detective identified a number of exhibits that were entered into evidence, including various photographs and shell casings that were removed from the crime scene.

The State rested. The defense moved for a judgment of acquittal on the grounds that there was insufficient evidence to support a conviction, which was denied. The defense then presented the testimony of Mr. Jeff Neuschatz, a professor of perception and experimental psychology at the University of Alabama and an expert in eyewitness identification. Mr. Neuschatz testified that he had performed various studies concerning human memory. Mr. Neuschatz testified that, in his professional opinion, it is difficult for people to remember the details of particular experiences that the individuals do not habitually experience. Moreover, eyewitnesses tend to "commit" once they have made an identification, meaning that once they pick an individual out of a lineup, they are more likely to pick out that same person again, not because the person chosen committed the crime but because they have become "committed" to the person they have selected. Mr. Neuschatz discussed numerous other difficulties with eyewitness identification, such as "unconscious transference" and "post identification feedback," and stated that, in his expert opinion, it is impossible for an individual to "never forget a face."

Following this testimony, the defendant was advised of and waived his right to testify in his own defense pursuant to the procedures described in *Momon v. State*, 18 S.W.3d 152, 162-64 (Tenn. 1999). The defense rested, the jury was instructed, and the jury retired at 4:35p.m. on April 15, 2009. On April 16, 2009, the jury resumed deliberations at 8:47 a.m. At 2:44 p.m., the trial court polled the jury and determined that no verdict had been reached. The jury consensus was to continue deliberations longer into the day and only to continue

into tomorrow if necessary. However, one juror, Juror Maloney complained: "Judge, I don't think – we've hashed this and hashed this and hashed it. And I don't think staying another day is going to change it. I think – we've discussed it from every angle." The judge listened and explained, "I would like to let you continue to deliberate a little further." At 3:35 p.m., the jury returned with a new foreperson. They retired for the evening and resumed deliberations the following day. When court opened the following day, the trial judge acknowledged the occurrence of an *ex parte* contact with a juror. During a jury-out meeting held on the record, the trial court described the circumstances and content of the *ex parte* contact as follows:

> All right. Have a seat. Bring the defendant in. I've talked to Mr. Mahoney. And he's a very nice gentleman. And he was just a little bit, you know, stressed, in a way. He's older than I thought he was, as a matter of fact. You know, I thought he was about my age and that's old enough. But, anyway, he works at Opryland in security. We talked. We didn't say one word about the trial. I just wanted to make sure his health was okay. And Alex was in there with me, sitting there as my trusted monitor or whatever it is. We said not one word about this trial. All we talked about is him and his health and his well-being. And I'm satisfied that after we talked, he's going to be fine. And he can handle this and he can come in here and then we're going to go ahead with deliberations. So – I mean, I did it in the best way I could do. And that's all I know to say. So bring the Jury in. He's a nice gentleman, he is.

Following the trial court's soliloquy, the record does not reflect that there was any objection made concerning this *ex parte* contact by the defendant, or that defense counsel made any motion seeking further clarification of the content of this *ex parte* conversation. The record reflects that the jury left the courtroom again at 8:52 a.m., and returned at 10:26 a.m. with a verdict. The defendant was found guilty of attempted first degree murder and especially aggravated robbery.

At a sentencing hearing held on May 22, 2009, the trial court heard testimony from numerous members of the defendant's family pleading for leniency, as well as arguments from both parties. The trial court found several enhancements factors to be applicable, including the facts that: the defendant had a prior criminal history including convictions above those necessary to establish his range; he had shown an unwillingness to comply with sentences including conditions involving his release into the community; and he had committed this offense while he was on probation. The court found the defendant's unstable home life to be a mitigating factor. Weighing the factors, the court found that the aggravating factors outweighed the mitigating factors and imposed a sentence of twenty-five years at thirty percent for the attempted murder and a sentence of eighteen years at one

hundred percent for the especially aggravated robbery. The trial court further found that, based on an analysis of the criteria contained in Tennessee Code Annotated section 40-35-115(b) (2009) and other relevant statutes, the defendant was an offender whose criminal activity was extensive. Consequently, the trial court ruled that his two sentences should be served consecutively.

On June 17, 2009, the defendant filed a timely motion for new trial. The trial court denied the motion on September 1, 2009. The defendant filed a timely motion of appeal on September 30, 2009, and this appeal properly followed.

## ANALYSIS

The defendant raises four issues on appeal. First, the defendant claims that the evidence is insufficient to support his convictions. Second, the defendant claims that the trial court erred by failing to suppress the victim's out-of-court and in-court identification of the defendant as the perpetrator. Third, the defendant claims that the trial court erred by having an *ex parte* meeting with a juror during the jury's deliberations. Finally, the defendant claims that the trial court erred by imposing consecutive sentences. After careful review, we deny each of these claims and affirm the judgments from the trial court.

## I.

The defendant contends that the evidence adduced at trial was insufficient to convince any rational trier of fact that he was guilty of attempted first degree murder and especially aggravated robbery beyond a reasonable doubt. "When there is a challenge to the sufficiency of the evidence, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011); *see also* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *Id.* (*quoting State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In this appeal, the defendant contends that the State failed to establish his identity as the perpetrator beyond a reasonable doubt and that the State failed to present evidence sufficient to establish that the defendant committed especially aggravated robbery (as opposed to outright theft). Our review of the record, however, has revealed sufficient evidence to support both of the defendant's convictions.

With respect to whether the State produced sufficient evidence that the defendant was the perpetrator of the victim's especially aggravated robbery and attempted murder, the

victim testified that he had met the defendant on two prior occasions, was familiar with the defendant, and recognized the defendant on sight. The victim further testified that he met with the defendant on the night in question in his car and that the defendant got into his car and took his drugs while simultaneously pulling out a gun and aiming it at him. The victim then testified that the defendant shot him repeatedly after stepping back out of the vehicle with the drugs. This testimony from the victim was sufficient to permit a reasonable jury to conclude that the defendant was the individual who committed the crimes on the night in question. In this particular case, we note that this victim's testimony was corroborated in a number of important respects by the testimony of other witnesses, including testimony by Mr. Lamont Butler to the effect that the defendant was on his way to a prearranged drug deal with the victim immediately prior to the robbery and shooting, and testimony from certain investigating officers and Mr. Butler to the effect that, immediately before the crimes, several calls from a phone number matching the defendant's number were made to the victim's cell phone.

Concerning the defendant's challenge to the sufficiency of the State's evidence with respect to his especially aggravated robbery conviction, at the time of his offense robbery was defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401 (2008). A robbery was especially aggravated if it was "[a]ccomplished with a deadly weapon" and "the victim suffer[ed] serious bodily injury." T.C.A.§ 39-13-403. If, however, a person had simply "knowingly obtain[ed] or exercise[d] control over . . . property without the owner's effective consent" with the "intent to deprive the owner of [the] property," then that person would have only been guilty of simple theft. T.C.A. § 39-14-103.

The defendant contends that although the evidence establishes that he stole property from the defendant, his use of a deadly weapon to commit violence and his infliction of fear and seriously bodily injury on the defendant are simply too temporally removed from the theft to support the jury's verdict. The defendant cites *State v. Owens*, 20 S.W.3d 634, 638 (Tenn. 2000), in support of his claim. In *Owens*, the Tennessee Supreme Court held that evidence would not support a finding that a shoplifter had committed robbery when, after being confronted, the shoplifter (1) dropped the stolen merchandise, (2) fled the store, and (3) had been pursued at least five blocks by security prior to turning and threatening a guard with a box cutter. The *Owens* court reasoned that "the use of violence or fear must precede or be contemporaneous with the taking of property from the person to constitute the offense of robbery under [Tennessee Code Annotated section] 39-13-401." *Owens*, 20 S.W.3d at 641.

This case is a far cry from *Owens*. As our supreme court has recently clarified, "[t]he temporal proximity between the taking of property and the use of violence or fear is the sole

relevant factor" that an "analysis in *Owens* requires [the reviewing court] to ascertain." *State v. Swift*, 308 S.W.3d 827, 831 (Tenn. 2010). Viewing this factor in isolation, we have little difficulty determining that the evidence in the record suffices to satisfy the *Owens* standard with respect to the temporal nexus between the theft and the additional elements necessary to establish the occurrence of an especially aggravated robbery. In assessing the temporal proximity between the theft and these additional necessary elements (*viz.* the use of violence or the causing of fear, and the displaying of a deadly weapon and the infliction of seriously bodily injury), the court "must ascertain when the taking was complete" and must determine that these elements "precede[d] or occur[red] contemporaneously with" the theft. *Id.* Here, the evidence establishes that the *Owens* proximity test is satisfied by actions both "preceding" and "contemporaneous" to the theft.

The victim testified that during the attempted drug transaction, the defendant reached out with one hand and exercised control over the victim's cocaine, while simultaneously pulling out a gun and holding it on the victim. The testimony of the victim also established that someone rifled through his pants after he had been shot, while the defendant demanded that the victim reveal the location of his money. The victim further testified that when he recovered from his shooting, he discovered that he had been dispossessed of several thousand dollars that he had possessed before the shooting occurred.

From the victim's testimony, a reasonable jury could have found that two of the required elements of especially aggravated robbery – the placing of the victim in fear (necessary to establish the commission of a robbery) and the brandishing of a deadly weapon – occurred contemporaneously with the defendant's theft of the victim's drugs. A reasonable jury could also have found that the one additional element necessary to support an especially aggravated robbery conviction – the infliction of serious bodily injury – occurred virtually simultaneously to that same theft.

Moreover, relying on this same testimony, a reasonable jury could have found in the alternative that all of the elements necessary to elevate a theft to especially aggravated robbery status – the use of violence or the placing of the victim in fear, the brandishing of a deadly weapon, and the infliction of serious bodily injury – occurred immediately prior to the defendant's theft of the victim's money. Consequently, whether the theft at issue is deemed to be one of drugs, money, or both, the evidence below suffices to sustain the defendant's especially aggravated robbery conviction against his *Owens* challenge. Accordingly, the defendant's challenges to the sufficiency of the evidence to support his convictions are denied.

## II.

The defendant's second claim is that the trial court erred by denying the defendant's motion to suppress the victim's eyewitness identification testimony. The rights granted by the due process clause of the Fourteenth Amendment of the United States Constitution and Article I, sections 8 and 9 of the Tennessee Constitution generally protect defendants from being convicted through the use of unduly suggestive identification techniques, and generally require a court to ask whether, under the totality of the circumstances, the identification at issue was reliable or whether there was high likelihood that a misidentification occurred. *See, e.g.*, *Neil v. Biggers*, 490 U.S. 188, 199-200 (1972); *State v. Reid*, 213 S.W.3d 792, 834-25 (2006). Factual findings "made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them." *Reid*, 213 S.W.3d at 825. "[T]his court must defer to the ruling of the trial court" unless a defendant shows "that the evidence preponderates against [that ruling]." *Id.* The defendant has not made any such showing in this case.

The United States Supreme Court has elucidated a two-part test to assess the validity of a pretrial identification procedure. *Id.* "Specifically, the court must determine (1) whether the procedure used to obtain the identification was unduly suggestive and (2) if the identification was unduly suggestive, the court must determine, under the totality of the circumstances, whether the identification is nevertheless reliable." *Id.* Here, as the trial court found, the procedures used by the police were not unduly suggestive; therefore, there is no need to engage in the second step of the *Biggers* analysis.

The record establishes that Detective Harbin testified during a suppression motion that approximately two months after the shooting, he talked to the victim and told the victim that he had spoken to Lamont Butler. At that same meeting with the victim, prior to showing the victim a photo lineup comprised of individuals possessing similar physical characteristics, Detective Harbin asked the victim to describe the shooter to him. The victim gave Detective Harbin a description that generally matched the defendant (using phrases such as "he had braids," he was "darker than me," and he was "maybe my height, a little shorter"). After hearing this description, Detective Harbin proceeded to show the photographic lineup to the victim, and the victim immediately identified the defendant as his shooter. As described in this testimony, there was nothing unduly suggestive about the identification procedure used by police.

However, the defendant urges that prior to showing the victim the photo array, Detective Harbin unduly suggested that the array contained a picture of the perpetrator. The defendant cites to the record in support of this assertion, in a passage quoting the victim as saying "[Harbin] just basically told me that he had talked to Lamont [Butler] and, you know, he was going to show me a lineup[, and] that they think that they had the guy who shot me." While it is true that the United States Supreme Court has intimated that the potential of a

given photographic array's suggestiveness is increased if "the police indicate to the witness that they have *other evidence* that one of the persons pictured committed the crime," *United State v. Simmons*, 390 U.S. 377, 383 (1968) (emphasis supplied), the mere "increased suggestiveness" that accompanies such an indication does not, standing alone, render the entire pretrial photographic identification procedure unconstitutional and require exclusion of any resulting evidence.

After careful review, we do not believe that the victim's testimony quoted above suffices to establish a *Simmons* constitutional violation. The quoted testimony does not seem to indicate that Detective Harbin suggested to the victim that the police had any independent "other evidence" linking any specific man depicted in that photo array to the crime. However, even if an insinuation to that effect could be drawn from the above-quoted testimony, this testimony was not considered by the trial judge in isolation. The record reflects, and follow-up questioning by defense counsel reveals, that the victim was apparently confused by defense counsel's entire line of questioning on this issue. On the following page of the transcript alone, the victim testified "I'm confused by your question" and "I don't remember telling [Detective Harbin] that" in response to defense counsel's attempts to characterize the victim's suppression hearing testimony in a light more favorable to the defense.

More importantly, regardless of any implications that might be drawn – correctly or incorrectly – from the victim's own testimony, the fact remains that Detective Harbin's testimony on the stand concerning the statements he made to the victim prior to showing him the photo array conflicts with the isolated statement of the victim that the defendant attempts to use to establish his constitutional claim. It was the duty of the trial court to resolve any issues of credibility with respect to the victim's testimony and to resolve any conflicts between the victim's testimony and the testimony of Detective Harbin. The trial court resolved those credibility issues against the defendant, and those findings are binding on appeal. *Reid*, 213 S.W.3d at 825. As the trial court explained:

> At a later date, [the victim] saw a photo lineup. The detective did tell him that someone had given him a person's name and he wanted him to look at the lineup, [but] did not tell him who it was in the lineup, [or that there] would be a person that he needs to identify. Didn't suggest in any way who he should identify. Laid the pictures on the table. This man said he immediately noticed the defendant before the detective said anything, and said, that's him.

This finding by the trial judge – that no unduly suggestive identification technique was used by police – being sufficiently supported by the record below, the defendant's claim that the trial court erred by denying his pretrial motion to suppress the victim's identification

testimony is denied.

### III.

Next, the defendant claims that the trial court erred by meeting with a juror off the record and outside the presence of counsel during the jury's deliberations. As discussed above, the trial judge admitted on the record in open court that he had an *ex parte* conversation with a juror – a conversation that was conducted off the record and with only another court employee present. It is firmly established law that judges should not have *ex parte* conversations with members of a deliberating jury. *See, e.g.*, *United States v. United States Gypsum Co.*, 438 U.S. 422, 460-61 (1978) ("Any *ex parte* meeting or communication between the judge and [a juror] of a deliberating jury is pregnant with possibilities for error."); *State v. Tune*, 872 S.W.2d 922, 928 (Tenn. Crim. App. 1993) ("Given the importance of judicial impartiality and fairness in appearance as well as in fact, it is generally considered improper for [a] trial judge to communicate with jurors off the record and outside the presence of counsel."). However, in the unfortunate event that such an error should occur, it is also well-established in this jurisdiction that this error is subject to harmless error analysis. *See Tune*, 872 S.W.2d at 928. To be entitled to relief, the error at issue must have caused "specific prejudice, either to [a defendant's] substantial rights or to the judicial process." *Spencer v. A-1 Crane Serv.*, 880 S.W.2d 938, 941 (Tenn. 1994).

On the record before us, we can discern no manner in which the conversation at issue affected the substantial rights of the defendant or harmed the judicial process. The defendant, *inter alia*, failed to enter a timely objection to the *ex parte* contact, failed to request that the trial judge make a more complete entry into the record concerning the details of the conversation at issue, and failed to request that the trial judge hold an evidentiary hearing at which the testimony from the other judicial employee (who allegedly witnessed this conversation) could have been taken. Yet, on appeal, the defendant seeks to capitalize on these very failings.

The defendant claims (both in his initial brief and on reply) that the dearth of evidence in the record concerning the precise content of this *ex parte* communication necessitates reversal on the grounds that, without a complete record, a complete absence of prejudice to the defense cannot be fully established. However, any blame for the lack of a proper record in this case falls squarely on the defendant. An objection to this *ex parte* contact needed to be lodged, and a full record concerning the content of this conversation needed to be developed before the jury returned with its verdict. It has long been established in this state that "[a] party cannot witness misconduct on the part of the court, await the result of the verdict, and then, if it is against him or her, object to the alleged misconduct." *Tune*, 872 S.W.2d at 930.

-13-

Even had this issue not been waived, we can discern from the record no manner in which either the defendant or the justice system suffered any sort of prejudicial effect from the trial judge's well-intentioned, albeit legally erroneous, inquiry into the ongoing health status of this elderly juror. The defendant's claim is therefore denied.

**IV.**

Fourth, the defendant challenges the fact that he was ordered to serve his two prison sentences consecutively. "The determination of [whether or not to impose] concurrent or consecutive sentences is a matter left to the sole discretion of the trial court." *State v. Blouvet*, 965 S.W.2d 489, 495 (Tenn. Crim. App. 1997). "The [trial] court may order sentences to run consecutively if it finds by a preponderance of the evidence that one or more [of the] statutory criteria exists." *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). The relevant statutory criteria are listed in Tennessee Code Annotated section 40-35-115(b), which permits the consecutive sentencing of a defendant convicted of multiple offenses if:

(1)    The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2)    The defendant is an offender whose record of criminal activity is extensive;

(3)    The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4)    The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5)    The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

-14-

(6)     The defendant is sentenced for an offense committed while on probation; or

(7)     The defendant is sentenced for criminal contempt.

The trial court found by a preponderance of the evidence that the defendant was an offender whose record of criminal activity was extensive and imposed consecutive sentences pursuant to section 40-35-115(b)(2).

The defendant asserts that the trial court erred by finding that he met this statutory criterion. The record reflects, and the defendant concedes, that the defendant has a criminal record including one felony and nine misdemeanor convictions. While the defendant urges that most of his offenses, including his felony, were nonviolent (*e.g.,* some driver's license offenses and some convictions for drug possession), the plain terms of section 40-35-115(b)(2) do not impose any requirement that the defendant's criminal record evidence any form of violence prior to its application. With respect to the defendant's argument concerning his lack of multiple prior felony convictions and his low total number of offenses, the trial court heard the defendant's arguments on this subject and determined that, nonetheless, while "[i]t may not be a bunch of felony convictions . . . it's just over and over and over and over and over criminal activity." In other words, the trial court found that the defendant's numerous misdemeanor convictions sufficed to render his record extensive. "It is not the function of this Court to substitute its judgment for that of the trial court" concerning the appropriateness of imposing consecutive sentences. *Blouvet*, 965 S.W.2d at 495.

Finally, the defendant agues that even if the record supports the trial judge's decision to impose consecutive sentences pursuant to the statutory criterion, the total effective aggregate sentence imposed by the trial judge for the defendant's crimes was "excessive." It is true that in addition to satisfying one or more of the criteria listed in section 40-35-115(b), "consecutive sentencing is guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed.'" *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002) (*quoting* T.C.A. §§ 40-35-102(1), 40-35-103(2)). After careful review, we conclude the trial court did not err in ordering the defendant's sentences to be served consecutively in light of these factors. In this case, the record reflects that during the course of executing a planned robbery and murder, the defendant callously and without hesitation shot the victim numerous times and left him to bleed to death. Therefore, the defendant's challenge to the consecutive nature of sentencing is denied.

**CONCLUSION**

-15-

For the foregoing reasons, the judgments from the trial court are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE