IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 21, 2013 Session

## ROBERT CHARLES TAYLOR v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Bradley County**
**No. M-10-537   Don W. Poole, Judge Sitting by Designation**

---

**No. E2012-01625-CCA-R3-PC - Filed December 20, 2013**

---

The Petitioner, Robert Charles Taylor, appeals the Bradley County Criminal Court's denial of his petition for post-conviction relief from his 2006 conviction for attempt to commit rape of a child. The Petitioner was originally sentenced to thirty years' confinement, but the court granted post-conviction relief and reduced his sentence to twelve years. The Petitioner contends that he was prejudiced by (1) counsel's failure to ensure his presence during jury selection, (2) counsel's failure to request a hearing pursuant to *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999), and (3) the trial judge's entry into the jury room during deliberations. We reverse the judgment of the trial court and vacate the conviction because the Petitioner was denied his right to be present for the jury selection process.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Conviction Vacated; Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Kenneth L. Miller, Cleveland, Tennessee, for the appellant, Robert Charles Taylor.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; R. Steven Bebb, District Attorney General; and Cynthia A. LeCroy-Schemel, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case arises from the Petitioner's attempted sexual penetration of a ten-year-old child. This court summarized the facts of the case in the appeal of the Petitioner's conviction:

The minors in this case, including the victim, will be referred to by their initials. C.W., the victim, testified that he was born on December 28, 1992, and he was ten years old in August 2003 when the incident occurred. C.W. said that he spent the night with his grandfather on August 16, 2003. The next morning he played and rode bikes with his friends. Later that day, C.W. said that Defendant approached him and his two friends and asked about M.B, another one of C.W.'s friends. Defendant said that he wanted to take M.B. camping. C.W. told Defendant that he wanted to join them, and Defendant agreed. C.W. said that he had not met Defendant prior to this encounter.

Defendant drove off, and M.B. approached C.W. a short time later. M.B. and C.W. went to M.B.'s house so that C.W. could call his mother, Brandy Swafford, and ask her permission to go on the camping trip. At first Ms. Swafford did not want C.W. to go, but then she said, "All right. Let me come to meet him, and I might let you go." C.W. said that he waited approximately one hour and then decided to leave with Defendant and M.B. without seeing Ms. Swafford.

The group drove toward the campground in Defendant's vehicle. Defendant stopped at a gasoline station, and the young men bought snacks. Defendant rented a cabin at the KOA Campground. It was growing dark, so the group unloaded the car and then watched television. C.W. said that the first floor was one large room with bunk beds against the wall and one larger bed. The bathroom was upstairs. C.W. said that he and M.B. talked as they got ready for bed. C.W. climbed into the top bunk of the bunk bed, M.B. got into the larger bed, and Defendant laid down on the bottom bunk. C.W. and M.B. continued to laugh and giggle. Defendant told them to stop, and then he reached for C.W. and told him to get into the bottom bunk. C.W. climbed down the bed's ladder, and Defendant grabbed him from the rear. Defendant pulled C.W. down until they were lying down on the bottom bunk with C.W. on top of Defendant's chest.

Defendant got up to go to the bathroom and returned in approximately five minutes. C.W. was lying beneath the covers of the bottom bunk bed wearing shorts and a tee-shirt. Defendant crawled into bed with him. C.W. woke up at some point during the night and discovered that he was naked. C.W. was lying on his stomach, and Defendant was kissing him on the outside of his buttocks. Defendant turned C.W. over and kissed C.W.'s groin area. Defendant took C.W.'s penis into his mouth and then flipped C.W. back on to his stomach. Defendant touched C.W.'s buttocks with his penis, and C.W. told

Defendant that his uncle was a policeman. Defendant responded, "I don't care." C.W. acknowledged that this statement was not true, but he said that he was trying to make Defendant stop.

C.W. told Defendant to stop two or three times, and they wrestled. C.W. struck Defendant, and Defendant struck him back with a closed fist, bruising C.W.'s face. Defendant got out of the bunk bed, and C.W. tucked the covers under himself and went back to sleep. C.W. said that when he next woke up, Defendant was in bed with M.B. C.W. saw Defendant penetrate M.B. with his penis for approximately ten minutes, and then C.W. fell asleep again.

C.W. said that Defendant took the young men swimming the next morning and then they ate lunch at a fast food restaurant. Defendant laid his wallet on the table, and C.W. removed his driver's license and a key when Defendant was not looking. C.W. said that he wanted to let the police know Defendant's identity. C.W. told Defendant, "I just took something from you." Defendant asked what C.W. had taken several times. C.W. handed him the key, and Defendant put the key in his pocket.

Defendant bought some bottle rockets at a fireworks store, and they set them off in a field. Defendant next drove to a flea market and bought the boys several items. Defendant told the boys not to tell anyone about what happened the night before, and C.W. said, "Okay."

Defendant dropped C.W. off at his house. C.W. went to a neighbor's house across the street where he told seventeen-year-old "Eldon" what had happened in the cabin because he thought Eldon was a policeman. C.W. gave Eldon Defendant's driver's license. Eldon left to find C.W.'s parents. After they returned, his parents called the police.

On cross-examination, C.W. said that he did not remember talking with Tammy Walker at the Children's Advocacy Center on August 21, 2003. C.W. acknowledged that he reviewed the videotape of the interview three days before trial. C.W. said that he remembered saying that Ms. Swafford had told him that he could not go with Defendant to the campground. C.W. said that he did not remember stealing a ball from the convenience store where they stopped before arriving at the campground. C.W. did not remember telling Ms. Walker that he had seen cocaine, a rifle, and a pistol in Defendant's car, or that he had thrown six thousand dollars in currency out of Defendant's car

-3-

window. C.W. said that M.B. also struggled with Defendant and hit Defendant with a broom.

C.W. stated that he did not remember previously filing a complaint against his uncle, Josh King, for sexual abuse. He also testified that he did not remember filing a similar complaint against Ryan Rogers. C.W. acknowledged that a KOA Campground brochure did not depict a television in the displayed cabin, but C.W. insisted that the cabin Defendant rented had a television.

Detective Donald Leon Shahan with the Bradley County Sheriff's Department testified that . . . Detective Shahan interviewed C.W. and Ms. Swafford on August 17, 2003. Detective Shahan stated that C.W. had a bruise above his left eye which appeared to be consistent with a blunt force trauma to the forehead. Detective Shahan said that he was given Defendant's driver's license during the interview. Detective Shahan also interviewed M.B. and M.B.'s mother before turning the case over to the criminal investigation division.

On cross-examination, Detective Shahan stated that he was present when Defendant was arrested, and he said that he could not recall seeing any marks or abrasions on Defendant. Detective Shahan did not recall seeing any drugs or weapons in Defendant's vehicle.

Detective Carl Maskew with the Bradley County Sheriff's Department testified that he obtained a receipt from the KOA Campground for one adult and two children for the rental of a cabin on August 16, 2003, with departure on August 17, 2003. The receipt was signed "Robert Taylor." Detective Maskew and other uniformed officers went to the residence of Defendant's sister to locate Defendant. The sister opened the door in response to their knock. One of the police officers shouted, "Someone's running out the back door." The police officers searched the back yard and located Defendant hiding in a large dog house.

Defendant . . . gave a brief statement in which he admitted being at the campground but said that if he had wanted to sexually abuse the boys, "he would have drugged them."

On cross-examination, Detective Maskew identified three other KOA Campground receipts, all signed by "Robert Taylor," for the rental of cabins on August 2, 2003, for two adults, one child; August 3, 2003, for two adults, one child; and August 9, 2003, for one adult, two children.

The trial court read the following stipulations into the record as agreed upon by Defendant and the State:

(1) As a result of the investigation of this matter, C.W. was seen by a medical doctor. The eye injury was minor.

(2) The results of the medical examination revealed no physical evidence to support a sexual assault.

(3) As a result of the investigation of this matter, M.B. was seen by a medical doctor three days after the allegation.

(4) The results of the medical examination revealed no physical evidence to support a sexual assault.

(5) Generally, there may be no physical evidence of an anal assault beyond seventy-two hours of the assault.

M.B. testified that he was thirteen years old at the time of trial. M.B. testified that he, Defendant, and C.W. went on a camping trip together. M.B. acknowledged that he remembered a conversation between Defendant and C.W. after C.W. stole a ball from a convenience store. M.B. said the group went swimming after they reached the campground and then went to bed. M.B. stated that there was no television in the cabin. M.B. testified that he fell asleep that night and did not wake up until the next morning. M.B. could not remember talking to the Children's Advocacy Center, the Department of Human Services, or the police about C.W.'S allegations.

On cross-examination, M.B. said that he observed Defendant crawling into the lower bunk bed with C.W. before M.B. got into the big bed. M.B. said that Defendant was lying on top of the bed covers. M.B. said that Defendant was in C.W.'s bed for "probably most of the night." M.B. acknowledged that he remembered telling Ms. Walker that he thought he was in trouble and that Defendant was "nasty" because he "touched kids." M.B. denied that Defendant touched him sexually and stated that he did not know if Defendant

has touched C.W. On redirect examination, M.B. stated that he did not know how long Defendant was in C.W.'s bed because he was asleep.

*State v. Robert Charles Taylor*, No. E2007-01868-CCA-R3-CD, slip op. at 1-4 (Tenn. Crim. App. May 26, 2009). The trial court sentenced the Petitioner as a Range III, career offender to an effective thirty-year sentence. *Id.*, slip op. at 1.

At the post-conviction hearing, Nancy Hobbs, the Petitioner's half-sister, testified that she was at the trial and that the Petitioner was absent from the courtroom during most of jury selection. She said the court officers walked the Petitioner into the courtroom when the last one or two jurors were selected. She denied counsel told her that he was considering leaving the public defender's office and starting a new job with the district attorney's office.

Ms. Hobbs testified that she was in the courtroom while the jury deliberated in an adjacent room. She said the trial judge entered the jury room three times while the jury deliberated. She denied that the prosecutor or counsel entered the jury room. She denied hearing the judge state before entering the jury room that the jury had a question or hearing the judge ask the attorneys if they waived entering the jury room. She said that during one of those three times, counsel was absent from the courtroom.

On cross-examination, Ms. Hobbs testified that she was not present for the pretrial motion hearings. She denied leaving the courtroom during the trial proceedings. She said that she and the Petitioner talked to counsel by telephone several times before the trial and that counsel discussed their strategy. She denied providing the Petitioner clothes for the trial but thought their mother might have provided them.

Ms. Hobbs testified that she and counsel did not discuss the Petitioner's testifying at the trial. She did not recall when the trial judge entered the jury room during deliberations, although she knew he entered the room three times. She said that counsel was not inside the courtroom on two of those occasions. She denied testifying at the sentencing hearing.

The Petitioner testified that counsel never discussed the possibility of counsel's leaving the public defender's office and taking a position with the district attorneys's office and that counsel failed to disclose that he applied for a position in the district attorney's office. He denied being present in the courtroom during jury selection and said a problem occurred with his clothes. He said his sister, Deborah, provided him clothes, but the court officers had to search the clothes for contraband and weapons. He said that when he entered the courtroom, most of the jury had been selected. He denied anyone told him that he had a right to be present during jury selection. He said this issue was not raised in the appeal of his conviction.

The Petitioner testified that nobody discussed with him whether he wanted to testify at the trial but that counsel said the State would address his previous convictions. He agreed that he had four 1981 New York convictions for sodomy and that the convictions occurred at the same time. He did not recall being present at a pretrial hearing to determine if the State might be permitted to introduce his previous convictions but said he was not present for "a lot of things" that happened in the courtroom.

The Petitioner testified that he recalled the trial court's prohibiting the State from introducing his previous convictions. He agreed, though, that counsel said his criminal history was admissible. He denied counsel questioned him in court about his right to testify at the trial. He said that had he been given the opportunity to testify at the trial, he would have denied the allegation. He said this issue was not raised in the appeal of his conviction. He said that although he was indicted in 2003, the trial did not occur until 2006 and that he was confined pending trial.

The Petitioner testified that he was provided a new attorney at the sentencing hearing. The record shows that the Petitioner's original counsel had a conflict of interest, that the trial court permitted counsel to withdraw, and that the court appointed subsequent counsel. The Petitioner said counsel at the sentencing hearing did not question whether he was a career offender or object to the classification. He did not know whether counsel presented the court with the New York statute showing the sodomy convictions were not Class B felonies. He denied the sentencing issue was raised in the appeal of his conviction.

The Petitioner testified that he underwent a psychological examination at Hiwassee Mental Health and that the examination consisted of five-minute interviews. He denied undergoing a thirty-day evaluation at Moccasin Bend. He said that to his knowledge, counsel did not request an independent mental health examination. He said counsel knew he had been hospitalized in mental health facilities.

On cross-examination, the Petitioner testified that he was incarcerated in New York from 1981 to 2000 and that he was not hospitalized for mental health reasons during that time. He said that after his release in New York, he began psychiatric treatment in McMinnville and took various medications. He admitted that he understood the proceedings and charges against him. He denied meeting with counsel many times and said they usually met for a few seconds before each court appearance. He said they talked about fifteen times. He said that counsel brought the Petitioner's sister, Deborah Thornberg,[1] to the jail and that

---

[1] The record reflects the Petitioner's sister's name as "Toornburg," "Thornburg," and "Thornberg." We use Thornberg.

counsel was sexually involved with her. He denied having proof of the relationship.

The Petitioner testified that at his second court appearance, he and counsel discussed his testifying at the trial. He denied that he and counsel discussed his testifying on the day of the trial. He said he did not know the trial court excluded from the trial his previous convictions. He said that he told counsel he wanted the couple who operated the campground, although he did not know their names, and Wendy Bishop, M.B.'s mother, subpoenaed for the trial. He said he was told that Ms. Bishop was "kidnapped" and taken to a Georgia jail. He said the couple who operated the campground would have testified that he rented a "tiny little cabin" rather than a two-bedroom cabin. He did not deny being at the cabin with the victims. He said that although Ms. Bishop was not present at the campground, she would have testified that he knew M.B., that he knew some of the people Ms. Bishop knew at the campground, and that he had "business dealings" there.

The Petitioner testified that he was sitting at the defense table when the trial judge entered the jury room. He said that the judge, the court clerk, and a few family members were the only people in the courtroom and that he was told he would be removed from the courtroom if he objected again. He denied knowing what the judge said to the jurors.

On redirect examination, the Petitioner testified that he was receiving psychiatric treatment at the time of the offenses. He said counsel did not obtain those records or the records from his treatment while he was incarcerated in New York.

Counsel testified that he became an assistant district attorney in 1986, that he became an assistant public defender in 1993, and that he returned to the district attorney's office in 2006. He denied discussing employment with the district attorney's office before the Petitioner's trial.

Counsel testified that the Petitioner was present during jury selection, that jury selection would not have began without the Petitioner, and that the trial judge would not have selected a jury in the Petitioner's absence. He denied that the Petitioner was delayed because the court officers had to search the clothes for contraband. He said the Petitioner argued with him and his sister and initially refused to wear the clothes but eventually agreed to wear them. He said that he had tried about forty to fifty cases before the trial judge and that the judge had never selected a jury in a defendant's absence. He said that the Petitioner was present for every pretrial hearing.

Counsel testified that he met with Ms. Thornberg several times and that she helped him with the Petitioner, who was agitated and difficult to deal with from the beginning of his representation. He did not recall meeting with Ms. Hobbs but said his file notes would

confirm any meetings. He said that he knew about the Petitioner's previous mental health issues but that the Petitioner refused to give him permission to obtain the records. He said that the Petitioner's mental health was evaluated and that he was deemed competent to stand trial. He did not obtain an independent mental health evaluation of the Petitioner and said the Petitioner understood the nature of the charges against him. He said the Petitioner consistently stated that the victim was lying and denied the allegation.

Counsel testified that he did not place on the record the Petitioner's decision regarding his right to testify but that he should have done so. He said that the Petitioner denied the victim's allegation and that he told the Petitioner that the Petitioner needed to tell the jury his side of the facts. He said the Petitioner refused to testify but did not explain why.

Counsel testified that he knew about the Petitioner's previous sodomy convictions in New York, that he successfully argued to exclude them at the trial, and that he moved to exclude them because he thought the Petitioner had a better chance of a successful outcome if he testified. He denied telling the Petitioner that the State would use his previous convictions against him if he testified. He said that on the day of the trial, he spoke to the Petitioner about testifying. He said that after the State presented its case-in-chief, he told the Petitioner that he needed to testify but that the Petitioner refused.

Counsel testified that he did not recall the trial judge's entering the jury room during deliberations. He said that if a jury had a question, the judge usually called counsel together, read the question, discussed how to answer the question, and permitted counsel to accompany him to the jury room. He said that although he was not in the courtroom, he doubted that the judge entered the jury room without counsel.

Counsel testified that he never had a sexual relationship with the Petitioner's sister. He said he met with the Petitioner twelve to fifteen times before the trial. He said most of their meetings at the jail lasted more than one hour. He said that he offered to provide the Petitioner with the State's discovery package but that the Petitioner did not want people at the jail to see the information. He said, though, they reviewed the discovery package on several occasions.

On cross-examination, counsel testified that he probably was not in the courtroom during all the jury's deliberations. He did not recall the Petitioner or his family's telling him that the trial judge entered the jury room. He said he thought the Petitioner's best chance of a successful outcome was for the Petitioner to testify that he was not guilty. He said that C.W.'s credibility was damaged on cross-examination and that M.B's testimony contradicted

C.W's testimony at the trial. He said that although he thought it was the best tactical decision for the Petitioner to testify, he did not know if the Petitioner's testifying would have changed the outcome of the trial.

Counsel reviewed a portion of the transcript regarding jury selection. He stated that the Petitioner was absent from the courtroom when the trial court called out names to determine who was present. He said, though, that the jurors had not been asked any questions at that point. He agreed the court stated that the Petitioner had refused to put on his clothes and that the court was going to proceed with the trial. Counsel said he requested a mistrial. He said that he believed the Petitioner entered the courtroom before the State began questioning prospective jurors. On redirect examination, he stated that although he wanted the Petitioner to testify at the trial, M.B.'s testimony placed the Petitioner in bed with C.W.

The trial court found that counsel failed to request a *Momon* hearing to establish the validity of the Petitioner's waiver of his right to testify. The court found that although counsel discussed before the trial the importance of the Petitioner's testifying, no evidence showed that counsel and the Petitioner discussed the topic the day of the trial. The court found that no evidence existed showing the Petitioner waived his right to testify and that waiver could not be presumed. The court found that counsel's performance was deficient. The court, though, credited counsel's testimony that the Petitioner was adamant about not testifying at the trial and found that the Petitioner was not prejudiced by counsel's deficiency.

The trial court found that although the evidence showed the trial judge entered the jury room, no evidence existed showing that the judge made threats or intimidated the jurors. The court found that counsel did not know about the judge's entering the jury room and was not deficient by failing to object.

The trial court found that the trial transcript showed that the Petitioner was absent from the courtroom for the majority of jury selection, although the Petitioner's and counsel's explanations for his absence differed. The court found that the Petitioner was initially uncooperative with counsel's request to wear civilian clothes and that the Petitioner did not know about his right to be present during jury selection. The court found, though, that no evidence showed the Petitioner wanted to be present. The court found that although counsel was deficient, the Petitioner failed to show prejudice.

The trial court granted post-conviction relief regarding the Petitioner's thirty-year sentence. The court found that the Petitioner was erroneously classified as a career offender based on his previous New York convictions. Although the court originally found that the New York convictions were Class B felonies in Tennessee, the court found that they were

Class E felonies. The court found that counsel's failure to object to the career offender classification was deficient performance and prejudicial. A corrected judgment was entered on July 9, 2012, reflecting a twelve-year sentence for attempt to commit child rape. This appeal followed.

As a preliminary matter, the State contends that the appeal should be dismissed because the Petitioner failed to file a timely notice of appeal. *See* T.R.A.P. 4(a) (stating that the notice of appeal "shall be filed . . . within 30 days after the date of entry of judgment appealed from"). The State argues that the court's order granting relief in part and denying relief in part was entered on November 29, 2011, and that the Petitioner was required to file a notice of appeal within thirty days. The Petitioner's notice of appeal was filed on August 1, 2012. The Petitioner responds that the trial court's granting sentencing relief required a new sentencing hearing, which was held on July 9, 2012. He argues that he could not file a notice of appeal until the court determined the new sentence because until the court resentenced him, he did not know whether to include the issue in his present appeal. When a trial court grants post-conviction relief regarding sentencing but denies relief regarding the underlying conviction, any appeal regarding the subsequent sentence is separate and apart from the post-conviction case. Although the Petitioner should have appealed the trial court's denial of post-conviction relief after the court's post-conviction ruling, we waive the filing of a timely notice of appeal and consider the issues on the merits in the interests of justice. *See id.*

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. *Id.* at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2012).

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because the Petitioner must also show that but for the substandard performance, there is "a reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The *Strickland* standard has been applied to the right to counsel under article

I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the *Strickland* test. *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability means a "probability sufficient to undermine confidence in the outcome." *Id.*

**I**

The Petitioner contends that he was prejudiced by counsel's failure to ensure his presence during jury selection. The State responds that the Petitioner failed to establish that his absence during the majority of jury selection resulted in prejudice. We conclude that the Petitioner is entitled to a new trial.

A defendant has a fundamental right to be present at the trial. *State v. Mosely*, 200 S.W.3d 624, 631 (Tenn. Crim. App. 2005); *see State v. Muse*, 967 S.W.2d 764, 766 (Tenn. 1998). A defendant "must be 'present in court from the beginning of the impaneling of the jury until the reception of the verdict and the discharge of the jury.'" *Id.* (quoting *Logan v. State*, 173 S.W. 443, 444 (Tenn. 1915)). Due process under the United States and Tennessee constitutions require a defendant's presence. *United States v. Gagnon*, 470 U.S. 522, 526 (1985); *Muse*, 967 S.W.2d at 766. Likewise, Tennessee Criminal Procedure Rule 43(a)(2) states, "Unless excused by the court on the defendant's motion . . . the defendant shall be present at every stage of the trial, including the impaneling of the jury[.]" Rule 43 exemplifies the constitutional protections guaranteed by the Confrontation Clause of the Sixth Amendment, the Due Process Clauses of the Fifth and Fourteenth Amendments, and the common law privilege of presence. *Muse*, 967 S.W.2d at 767. Although fundamental, a defendant may waive the right to be present. *Id.*; *see* Tenn. R. Crim. P. 43(b). In order to waive the right, a defendant must (1) know of the right and (2) personally waive it in writing or on the record before jury selection is conducted. *Muse*, 967 S.W.2d at 768.

The record shows that before jury selection, counsel told the trial court that the Petitioner's sister provided civilian clothes for him to wear during the trial but that the Petitioner refused to wear them. Counsel told the court that the Petitioner was upset with counsel. Counsel requested that jury selection proceed without the Petitioner and said that

it was possible the Petitioner's sister could persuade him to wear the clothes. The court granted the request. Counsel then requested a mistrial, which the court denied.

Jury selection began without the Petitioner. Although the record is silent regarding the length of time it took to select a jury, the court addressed the prospective jurors extensively regarding a juror's role in the court process, the burden of proof, and the nature of the charge. The prospective jurors were sworn in, and the court questioned them about whether they knew the prosecutor and counsel, any of the witnesses, and the Petitioner. The court discussed the ethical obligations of counsel and the witnesses not to talk to prospective jurors and the jurors' ethical obligations, including not discussing the case with other jurors before all the evidence was presented or performing outside investigations.

After addressing the prospective jurors collectively, the trial court asked the jurors if the nature of the allegation would prevent them from being objective. The court permitted jurors to approach the bench to discuss their concerns. The court excused one female juror who stated that she could not be objective after having already served as a juror in a child sexual abuse case. The court then permitted counsel and the prosecutor to question the prospective jurors.

The prosecutor addressed the prospective jurors collectively. He discussed the State's burden of proof, asked whether the jurors would have difficulty sitting in judgment over the Petitioner's guilt or innocence, and asked if any previous experience with the police or state government would prevent them from weighing the State's witnesses' credibility objectively. The prosecutor discussed the elements of rape of a child.

The prosecutor identified Detective Carl Maskew and Detective Shahan as witnesses and asked if the prospective jurors knew them. Two male jurors and two female jurors admitted knowing Detective Shahan, and each juror denied this would affect their ability to remain impartial. One female juror admitted knowing defense counsel and agreed she could remain impartial. The prosecutor discussed the various resources used by the district attorney's office to prosecute criminal offenses, including the police, the Tennessee Bureau of Investigation, crime laboratories, and the district attorney's office. Last, the prosecutor discussed direct and circumstantial evidence and told the jurors they could use circumstantial evidence in determining the Petitioner's guilt or innocence.

Defense counsel asked the prospective jurors collectively if they understood that the Petitioner's liberty was at stake. A bench conference was held out of the jurors' hearing regarding counsel's remark. The State argued that counsel was entering sentencing ground, which was within the trial court's purview, not the jurors'. The court overruled the objection, and defense counsel resumed addressing the jurors. Counsel told the jurors he wanted to

determine if they had "preconceived notions" that would prevent them from being impartial because of the nature of the charge. One female juror stated she could not remain impartial because she worked as a sexual abuse counselor. Counsel questioned her at length individually regarding the circumstances in which a child might make a false allegation of sexual assault. The court granted counsel's request that the juror be excused. Another prospective juror was selected from the venire who denied having any preconceived notions or knowledge about the facts of the case but admitted working at the KOA Campground where the offense occurred.

Counsel then discussed the indictment and told the prospective jurors that the indictment had no bearing on the Petitioner's guilt. Counsel asked the jurors whether they understood, but no response was recorded in the transcript. Counsel questioned a female juror who taught elementary school about her experience investigating instances in which children told opposing stories. She agreed that children sometimes told "little fabrication[s]" and that "it just escalate[d]" when they were caught lying. Counsel asked the jurors if they knew anyone who had been "involved" in a similar allegation as that involving the Petitioner. The same female juror knew someone accused of a similar crime seven or eight years previously but denied it would affect her impartiality. A second female juror knew someone involved in a similar allegation but said she would try not to let it affect her impartiality. She agreed, though, that if she were accused of rape of a child, she would not want someone on the jury who said she would try not to let her experience affect her impartiality. A bench conference was held during which the juror said that a co-worker's grandchild was accused of a similar offense and that the case was still pending. The juror was excused when she told the judge that she would have too much sympathy for the child.

Another bench conference was held after the trial court interrupted a female juror who stated, "My grandson . . . alleged that his father. . ." The juror said she thought she could remain impartial, listen to the evidence, and base a verdict solely on the evidence presented at the trial. The bench conference ended, counsel asked what, if anything, came of the allegation, and she said the matter was resolved twelve or thirteen years previously. She said she could remain impartial.

Counsel asked the prospective jurors if they had close friendships with police officers. Two jurors admitted having family members who were out-of-state police officers. One of these jurors denied this would affect his impartiality, but no discernable response was recorded when the other juror was asked if this would affect her impartiality. One juror admitted his son-in-law was a Bradley County police officer, and another juror identified his two brothers-in-law as city police officers. Both jurors admitted they could remain impartial, and counsel stated that he knew both city police officers. One female juror identified her brother-in-law as an out-of-state prosecutor, and another juror stated her husband's niece was

-14-

married to a local police officer. Both jurors said they could remain impartial. Last, counsel discussed the presumption of innocence and the burden of proof.

The trial court introduced the various court personnel present in the courtroom and explained the process by which the attorneys would request excusing prospective jurors. Strike forms were submitted to the court, and one female and two males jurors were excused. Three prospective jurors, two females and one male, were selected from the venire, and the court asked if they had responses to the questions asked previously. No audible responses were recorded, and no questions were asked. Strike forms were submitted to the court, and two of the three jurors selected from the venire were excused. Two additional female jurors were selected from the venire, and they had no responses to the questions asked previously. Strike forms were submitted to the court, and one male juror was excused. One female juror was selected from the venire, and she had no responses to the questions asked previously. Strike forms were submitted to the court, and one female juror was excused. One female juror was selected from the venire, and she had no responses to the questions asked previously.

A bench conference was held out of the prospective jurors' hearing. Counsel told the trial court that the Petitioner decided to wear his civilian clothes, and a court officer left the courtroom to confirm the Petitioner was ready to enter the courtroom. Jury selection resumed and strike forms were submitted to the court. One male juror was excused and replaced with another male juror, who requested a bench conference. During the bench conference out of the other jurors' hearing, the juror stated that he had the same name as the Petitioner and expressed his concern. Counsel said he did not object to excusing the juror, and the court excused the juror. A male juror was selected from the venire, and he had no responses to the questions asked previously. The prosecutor asked the juror from where he retired, and the juror said he retired from a Texas telephone company.

At a bench conference, counsel requested permission to talk to the Petitioner before the court officers escorted him into the courtroom. Court was recessed in order for counsel to speak with the Petitioner. The Petitioner entered the courtroom, and the prospective jurors returned to the courtroom. The court introduced the Petitioner to the jurors, and jury selection resumed.

Strike forms were submitted to the trial court, and one female prospective juror was excused. A male juror had a scheduling conflict, and the court excused him without objection. A male juror was selected from the venire, and he had no responses to questions asked previously. Counsel asked the juror about his employment, and the juror said he was the president of a local company. Strike forms were submitted to the court, and the juror who was the President of Cleveland Wood Products was excused. A male juror was selected from

the venire, and no questions were asked. Strike forms were submitted to the court, and the male juror last selected was excused. A male juror was selected from the venire, and he had no responses to questions asked previously. No questions were asked. Strike forms were submitted, and no jurors were excused. We note that only one of the stricken jurors was questioned individually during jury selection. She knew Detective Shahan. Two alternate jurors were selected without excusing further prospective jurors.

In the present case, the trial court found that the Petitioner was absent from the courtroom during "most of the process." It found that the Petitioner was uncooperative with counsel's request that the Petitioner wear civilian clothes. The court found that although no evidence showed that the Petitioner knew of his right to be present during jury selection or that he waived the right, no evidence showed he "wished to present." The court found that although counsel was deficient by failing to ensure the Petitioner's presence during jury selection, the Petitioner was not prejudiced.

We conclude that counsel was deficient in his duty to the Petitioner. In the absence of a written waiver, counsel should have requested that the trial court have the Petitioner brought into the courtroom and advised of his right to be present during the trial, including jury selection, advise him of the consequences of refusing to be present, and asked whether he intended to be present. We also conclude that counsel's requesting that jury selection proceed in the Petitioner's absence did not constitute a valid waiver of the right to be present. *See Muse*, 967 S.W.2d at 768 (concluding that counsel's stating to the trial court that the defendant was not going to be present for jury selection did not constitute a valid waiver).

The Petitioner argues that he is entitled to a presumption of prejudice because he was denied his fundamental right to be present. Our supreme court concluded that without an effective waiver, a defendant's absence from the entire jury selection process results "in such prejudice to the judicial process that automatic reversal is required." *Muse*, 976 S.W.2d at 768; *see State v. Ballard*, 21 S.W.3d 258, 262 (Tenn. Crim. App. 2000). Although the court did not address whether an automatic reversal is required when a defendant is absent for only a small portion of jury selection, it noted that other jurisdictions had concluded such absence was subject to harmless error analysis. *Muse*, 976 S.W.2d at 768 (citing *United States v. Gordon*, 829 F.2d 119,127-28 (D.C. Cir. 1987) (noting that in all the cases cited in which the defendant was absent for a small portion of jury selection process, the error was harmless)).

In *Curtis v. State*, 909 S.W.2d 465, 469 (Tenn. Crim. App. 1995), the petitioner was absent for a short period of time during jury selection because of a medical condition. Jury selection took approximately one hour. *Id.* Counsel informed the court that "it was agreeable to go ahead with jury selection," and two jurors and two alternates were selected in the Petitioner's absence. *Id.* This court concluded that because the petitioner was absent

for only a small portion of jury selection and had shown no prejudice, any error in proceeding with jury selection in the petitioner's absence was harmless. *Id.*

The record reflects that the Petitioner was absent for most of jury selection. Although the record is silent regarding the length of time it took to select the panel, jury selection comprised seventy-four pages of the transcript. The Petitioner was present for a time covered by nine pages. During the Petitioner's absence, the trial court addressed the prospective jurors extensively, and the attorneys questioned the jurors extensively about various topics, including the presumption of innocence, the burden of proof, the purpose of the indictment, whether the jurors knew the potential witnesses, the nature of the charge against the Petitioner, the State's resources to prosecute criminal cases, direct and circumstantial evidence, whether the jurors had preconceived notions about the Petitioner's innocence or guilt, whether the jurors knew anyone accused of a similar offense, and whether the jurors had close relationships with law enforcement officers. We note that three jurors were excused for cause during the Petitioner's absence because of an inability to remain impartial and because a juror had the same name as the Petitioner. After the Petitioner entered the courtroom, one juror was excused because of a scheduling conflict. The record shows that five rounds of voting occurred in the Petitioner's absence and that eight peremptory challenges were exercised, although the record fails to show which party exercised the challenges. The record shows that after the Petitioner entered the courtroom, three peremptory challenges were exercised and that two alternates were selected without further exclusions.

We conclude that a defendant's right to be present during jury selection compels a presumption of prejudice and an automatic reversal of the conviction when a defendant, who has not provided an effective waiver, is absent for almost all of the jury selection process. We note, though, that the Petitioner does not claim that his fundamental right to be present at the trial was violated and does not allege in his petition for post-conviction relief or in his appellate brief that counsel provided ineffective assistance by failing to raise in the appeal of his conviction the issue of the Petitioner's absence during jury selection. Likewise, at the post-conviction hearing, counsel was not asked why he did not raise the issue in the appeal of the conviction, although he requested a mistrial after the trial court stated it would begin jury selection in the Petitioner's absence. Instead, the Petitioner argues, in the context of ineffective assistance, that he was prejudiced by counsel's deficient performance in failing to ensure his presence during the jury selection process.

The State argues in its brief that the Petitioner was required to raise the issue of his absence during jury selection in the appeal of the conviction and that this failure results in waiver. *See* T.C.A. § 40-30-106(g) (2010). Our supreme court has concluded that "a petitioner is deemed to have waived a ground for post-conviction relief if, at the time of a

prior hearing, that claim was available and a petitioner failed to raise it." *Allen v. State*, 854 S.W.2d 873, 875 (Tenn. 1993) (citing T.C.A. § 40-30-112(b)(1)). Likewise, the court has concluded that "[a] ground for relief is 'waived' if the petitioner knowingly and understandingly failed to present it for determination in any proceedings before a court of competent jurisdiction in which the ground could have been presented." *House v. State*, S.W.2d 705, 710 (Tenn. 1995).

Our appellate courts, though, have concluded in the context of lesser included offense jury instructions that a post-conviction court may grant relief if it would have been warranted had the issue been raised in the direct appeal of the conviction. *See Darryl Lee Elkins and Rhoda Grills v. State*, Nos. E2005-02153-CCA-R3-PC and E2005-02242-CCA-R3-PC, slip op. at 9 (Tenn. Crim. App. Jan. 7, 2008) (concluding that the trial court properly granted post-conviction relief when counsel failed to raise on appeal issues related to omissions of lesser included offenses in the jury instructions and the exclusions would have resulted in new trials had it been raised in the appeal of the petitioners' convictions), *perm. app. denied* (Tenn. May 27, 2008). In *Wiley v. State*, 183 S.W.3d 317, 330 (Tenn. 2006), our supreme court concluded that trial counsel was deficient by failing to request a jury instruction related to a lesser included offense, failing to raise the issue in the motion for a new trial, and failing to preserve the issue for appeal. Likewise, the court concluded that the petitioner was prejudiced by counsel's deficient performance because the evidence at the trial supported the omitted instruction and because a reasonable juror might conclude that the petitioner was guilty of a lesser included offense. *Id.* The court granted the petitioner a new trial because he would have been entitled to a new trial had the issue been preserved and raised in the appeal of his conviction. *Id.* at 331.

We apply the rationale used in *Wiley* and *Darryl Lee Elkins and Rhoda Grills* to the present case. As with jury instructions, the right to be present at a trial involves a fundamental constitutional right. *See State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990) (constitutional right to a correct and complete charge of the law that ensures a fair trial); *see also Gagnon*, 470 U.S. at 526; *Mosely*, 200 S.W.3d at 631; *Muse*, 967 S.W.2d at 766 (fundamental and constitutional right to be present at trial). We have concluded above that a defendant's right to be present during jury selection compels a presumption of prejudice and an automatic reversal of the conviction when a defendant, who has not provided an effective waiver, is absent for almost all of the jury selection process. Counsel represented the Petitioner at the trial and in the appeal of the conviction. We have also concluded that counsel was deficient in his duty to the Petitioner by failing to request that the trial court have the Petitioner brought into the courtroom to advise him of his right to be present during the trial, including jury selection, advise him of the consequences of refusing to be present, and ask whether he intended to be present. This deficient performance continued after the trial because counsel failed to raise the issue in the motion for new trial and in the appeal of the

Petitioner's conviction. Had counsel preserved the issue for appeal in the motion for a new trial and raised the issue in the appeal of the conviction, the Petitioner would have established reversible error and been entitled to a new trial. As a result, the Petitioner has established prejudice under *Strickland*. *Strickland*, 466 U.S. at 694. The Petitioner is entitled to post-conviction relief on this basis.

## II

The Petitioner contends that he was prejudiced by counsel's failure to request a *Momon* hearing. The State responds that the Petitioner received the effective assistance of counsel. We agree that the Petitioner is not entitled to relief.

The United States and Tennessee Constitutions afford every defendant the right testify at his or her trial. *Rock v. Arkansas*, 483 U.S. 44, 49-52 (1987); *State v. Burkhart*, 541 S.W.2d 365, 371 (Tenn. 1976). Our supreme court has stated that "the right of a criminal defendant to testify in his or her own behalf is a fundamental constitutional right." *Momon v. State*, 18 S.W.3d 152, 161 (Tenn. 1999). The right to testify, though, may be waived if evidence exists showing "an intentional relinquishment or abandonment" of the right to testify. *Id*. at 161-62. Waiver of such a fundamental right cannot be presumed from a silent record, and this court should "indulge every reasonable presumption" against waiver. *Id*. at 162.

Our supreme court provided the proper procedure for trial courts to ensure that defendants are not deprived of their constitutional right to testify. *See id*. In this *Momon* hearing, counsel must show that a defendant "knows and understands" that:

> (1) the defendant has the right not to testify, and if the defendant does testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;

> (2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying; [and]

> (3) the defendant has consulted with . . . counsel in making the decision to whether . . . to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally waived the right to testify.

*Id*. The failure to conduct this hearing, though, "will not in and of itself support a claim for deprivation of the . . . right to testify if there is evidence in the record to establish that the

-19-

right was otherwise personally waived by the defendant." *Id*. at 163.

At the trial, counsel failed to ensure that a *Momon* hearing was conducted. Although we conclude that counsel provided deficient performance, the Petitioner has failed to show that he was prejudiced by counsel's deficient performance. The trial court credited counsel's testimony that he told the Petitioner that he needed to testify but that the Petitioner refused to do so. The evidence shows the Petitioner waived his constitutional right to testify at the trial. The Petitioner has failed to establish prejudice and is not entitled to relief on this issue.

### III

The Petitioner contends that he was prejudiced by counsel's failure to object to the trial judge's entering the jury room during deliberations. The State responds that the Petitioner failed to establish that counsel was deficient or that he suffered prejudice. We agree with the State.

"Given the importance of judicial impartiality and fairness in appearance . . . , it is generally considered improper for the trial judge to communicate with jurors off the record and outside the presence of counsel." *State v. Tune*, 872 S.W.2d 922, 928 (Tenn. Crim. App. 1993). *Ex parte* communications between jurors and a trial judge "should be avoided even if counsel agrees[.]" *Williams Lewis Houston v. State*, No. M2003-00304-CCA-R3-PC, slip op. at 5 (Tenn. Crim. App. June 16, 2004), *perm. app. denied* (Tenn. Oct. 4, 2004). A Petitioner, though, is still required to establish that counsel's failure to object to any ex parte communication gave rise to prejudice. *Id*.

The record reflects that after the jury began deliberations, the trial judge stated that the jurors had a question

> about probable doubt, and I said that's not a legal term, just consider reasonable doubt. And someone asked about that video, and I said, "I can't respond to that, that deals with evidence, and I can't answer anything about a video." I think they're wondering why they didn't see it[.]

The record shows that after the court made this statement, the jury continued its deliberations. The record fails to show whether counsel and the prosecutor were present in the courtroom, whether the trial judge entered the jury room, and if so, whether the prosecutor and counsel accompanied the judge. Counsel testified that although he was not in the courtroom during all of the jury's deliberations, he doubted the judge entered the jury room because it was the judge's practice to call counsel together, read the question, discuss how to answer it, and permit counsel to accompany him to the jury room.

Although the record fails to show when, the trial judge stated later that the jurors "wanted to have [M.B.]'s testimony typed up, so I have to tell them the only thing I could do would be to replay it, if they wanted to hear it[.]" Counsel asked the trial court if it was going to replay the recording for the jury, and the court said it was going to ask the jurors if they wanted to view it again. Counsel agreed and did not object. The record only shows that the prosecutor and counsel were present for the court's statement and that the jurors continued deliberating and returned its verdict without further interruption. The record fails to show whether the trial judge entered the jury room.

Regarding the jury's first question, we conclude that the record fails to detail what transpired after the trial judge stated the jury's question. The inference could be drawn that the judge entered the jury room *ex parte*. Likewise, the inference could be drawn that the judge answered the jury's questions by a written note delivered by a court officer. The record fails to show the procedure the court took to answer the juror's question, and we will not speculate. Any courtroom discussion about the jury's question in counsel's absence was improper. Likewise, any discussion in counsel's absence by the judge inside the jury room was improper. We note that counsel admitted being absent from the courtroom during a portion of the deliberations. If counsel was absent from the courtroom and not called into the courtroom by the judge to discuss the jury's question, he could not have objected. No evidence exists showing counsel provided deficient performance.

Regarding the jury's second question, counsel was present for the courtroom discussion, but the record is silent about what the judge did after it decided to ask the jurors if they wanted to return to the courtroom to view the recording of the witness's testimony. We conclude that the Petitioner has failed to establish prejudice.

The Petitioner also argues that the State had the opportunity to call the trial judge as a witness at the post-conviction hearing to clarify what occurred during jury deliberations but did not and is entitled to relief. This argument is misplaced. In a post-conviction proceeding, the petitioner, not the State, has the burden of proving his allegations by clear and convincing evidence. T.C.A. § 40-20-110(f) (2012). The Petitioner had the burden of establishing that the judge entered the jury room ex parte, that counsel did not object to the ex parte communication, and that a reasonable probability existed that the judge's purported communication with the jurors affected the outcome of the trial. He is not entitled to relief.

-21-

In consideration of the foregoing and the record as a whole, the judgment of the trial court is reversed, the conviction is vacated, and the case is remanded for further proceedings consistent with this opinion.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE